## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

JONATHAN MUNT, GLORIA J. HARMON,
and SANDRA M. WINGERS, individually,
and as Representatives of a Class of
Participants and Beneficiaries of the
WEC Energy Group Employee Retirement
Savings Plan,

Plaintiffs,

v.

WEC ENERGY GROUP, INC.

and

BOARD OF DIRECTORS OF WEC ENERGY
GROUP, INC., CURT S. CULVER, DANNY L.
CUNNINGHAM, WILLIAM M. FARROW III,
CRISTY GARCIA-THOMAS, MARIA C.
GREEN, GALE E. KLAPPA, THOMAS K. LANE,
SCOTT J. LAUBER, ULICE PAYNE JR., MARY
ELLEN STANEK, AND GLEN E. TELLOCK,

Defendants

Case No.

CLASS ACTION COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiffs, Jonathan Munt, Gloria J. Harmon, and Sandra M. Wingers,

individually and as representatives of a Class of Participants and Beneficiaries of the WEC

Energy Group Employee Retirement Savings Plan (the "Plan" or "WEC Energy Plan"), by

their counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and

asserts to the best of their knowledge, information, and belief, formed after an inquiry rea-

sonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, WEC Energy Group, Inc. ("WEC Energy") and the Board of Directors of WEC Energy Group, Inc., including Individual Members, Curt S. Culver, Danny L.

Cunningham, William M. Farrow III, Cristy Garcia-Thomas, Maria C. Green, Gale E. Klappa, Thomas K. Lane, Scott J. Lauber, Ulice Payne Jr., Mary Ellen Stanek, and Glen E. Tellock ("Board Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as WEC Energy Group Employee Retirement Savings Plan (the "Plan" or "WEC Energy Plan") – that it sponsors and provides to its employees.

6.      During the putative Class Period (May 10, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and managed account] fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeepers, Fidelity Investments Institutional ("Fidelity") and WEC Business Services LLC ("WEC Business") (collectively "Fidelity.")

7.      Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by "offer[ing] needlessly expensive investment options," in the form of high-cost share classes, high-cost and underperforming target-date funds (Fidelity Freedom Fund Active Suite), and underperforming money market funds. *See Hughes*, 142 S. Ct. at 740.

8.      These objectively unreasonable recordkeeping, managed account, and investment fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9.        Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered the same investment opportunities at a lower cost, and by causing the Plan participants to pay excessive recording and managed account fees.

10.        Defendants engaged in self-dealing in violation of ERISA's duty of loyalty, Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and fiduciary prohibited transaction provisions, Section 406(b)(1), 29 U.S.C. § 1106(b)(1), with regard to administration of the Plan by paying itself with plan assets under the guise of its subsidiary, WEC Business.

11.        Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping, managed account, and investment services.

12.        ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees, as well as selecting and retaining investments, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

13.        There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

14.        The unreasonable recordkeeping and managed account fees paid, as well as the unreasonable selection and retention of Plan investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

15.        These breaches of fiduciary duty, and violation of the prohibited transaction provisions, caused Plaintiffs and Class Members millions of dollars of harm in the form of

lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

16.     To remedy these fiduciary breaches and prohibited transactions, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

18.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

20.     In conformity with 29 U.S.C. §1132(h), Plaintiffs served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

21.     Plaintiff, Jonathan Munt, is a resident of the State of Wisconsin and currently resides in Burlington, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

22.     Plaintiff Munt has been a Plant Electrician at the Valley Power Plant location of WEC Energy in Milwaukee, Wisconsin, from 2006 to the present. He currently is invested

in the following Plan investments: Fidelity Low PR Stock Pool Large Cap, Fidelity 500 Index, Fidelity Growth Commingled Pool, Fidelity Growth Commingled Pool CL 2 Company, WEC Common Stock ESOP, Fidelity Inflation PR Bond Index, and Fidelity Balanced K.

23.     Plaintiff, Gloria J. Harmon, is a resident of the State of Wisconsin and currently resides in Glendale, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

24.     Plaintiff Harmon was an Energy Service Consultant at the Green Bay Road location of WEC Energy in Milwaukee, Wisconsin, from 1980 to 2020. She currently is invested in the following Plan investments: Fidelity Freedom Fund 2020 K6, Fidelity Freedom Fund 2025 K6, WEC Common Stock ESOP, and Fidelity Balanced K.

25.     Plaintiff, Sandra M. Wingers, is a resident of the State of Wisconsin and currently resides in Glendale, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

26.     Plaintiff Wingers most recently has been a Generation Storeroom Specialist at the Valley Power Plant location of WEC Energy in Milwaukee, Wisconsin, from 1998 to the present. She currently is invested in the following Plan investments: Fidelity Balanced Fund Class K, Fidelity International Index Fund, Federated Hermes MDT Small Cap Core Fund Institutional Class, Fidelity Mid-Cap Index Fund, Fidelity Low-Priced Stock Commingled Pool, Fidelity Growth Company Commingled Pool Class 2, Blended Rate Income Fund, Fidelity U.S. Bond Index Fund, Fidelity Inflation-Protected Bond Index Fund, and WEC Common Stock ESOP.

27.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan account through paying excessive record-

keeping and managed account fees, and by holding the Fidelity Freedom Fund and the Fidelity Institutional Money Market Government Fund during the Class Period, those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Fidelity as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiffs and Class.

28.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

29.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping, managed account, and investment fees) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

30.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

31.     WEC Energy Group, Inc. ("WEC Energy") is one of the nation's largest electric generation and distribution and natural gas delivery holding companies. WEC Energy provide energy services to more than 4.6 million customers in Wisconsin, Illinois, Michigan, and Minnesota. Its United States headquarters are located at 231 W. Michigan Street, Milwaukee, WI 53203. In this Complaint, "WEC Energy" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

32.     WEC Energy acted through its officers, including the Board of Directors and its Individual Members (collectively "Board Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. WEC Energy appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, WEC Energy is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

33.     WEC Energy is also the Plan Administrator. As the Plan Administrator, WEC Energy is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). WEC Energy has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

34.     To the extent that there are additional officers and employees of WEC Energy who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.

35.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that WEC Energy' contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

36.     In 2020, the Plan had about $1,853,141,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees

and expenses. Defendants, however, did not regularly monitor Fidelity to ensure that Fidelity, and the Plan investments and services selected, remained the prudent and objectively reasonable choice.

37.     With 4,974 participants in 2019, the Plan had more participants than 99.61% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,853,141,000 in assets in 2019, the Plan had more assets than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

38.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

39.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

40.     Although WEC Energy contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees, managed account fees, or investment fees.

41.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce

retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

42.    Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

43.    Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

## Recordkeeping Services

44.    Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Fidelity is one such recordkeeper.

45.    These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the same level and quality.

46.    There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The Bundled RKA services include, but are not limited to, the following standard services:

     a.    Recordkeeping;

b.   Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund (if needed);

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

47.   The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

48.    These "Ad Hoc RKA" services typically include, but are not limited to, the following:

a.    Loan processing;

b.    Brokerage services/account maintenance;

c.    Distribution services; and

d.    Processing of Qualified Domestic Relations Orders (QDROs).

49.    For mega plans, like the WEC Energy Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

50.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

51.    The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

52.    Because dozens of Recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

53.    Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

54.    Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they re-

quest that the Bundled RKA revenue requirement be expressed as either a flat per partici-pant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice and permits recordkeepers to increase revenue without necessarily providing any additional value in services.

55.     While there may be minor differences in the way the Bundled RKA services are delivered, those differences are deemed immaterial to the price comparisons in virtually all cases.

56.     Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment educa-tion sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

57.     The WEC Energy Plan had a standard package of Bundled RKA services, providing RKA services of a nearly identical level and quality to other recordkeepers who service other mega plans.

58.     There is nothing in the service and compensation codes disclosed by the Plan Fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual "recordkeeping fees" or "other administrative fees" charged to participants included any services that were unusual or above and beyond the standard recordkeeping and ad-ministrative services provided by all national recordkeepers to mega plans.

59.     Accordingly, the disparity between the Plan's recordkeeping fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services, or the quality of those services, provided by Fidelity to the Plan.

60. Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

61. Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

62. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the WEC Energy Plan. In other words, reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

63. The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

64. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

65. As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have

to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

66.     Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

67.     Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiffs express no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average*) given the applicable market.

68.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

## Investments

69.     Plan fiduciaries of a defined contribution plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan participants.

70.     The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

71.     In selecting different investment options to make available to plan participants, plan fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options.

72.     When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

Thus, the primary emphasis when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

73.     In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes.

74.     When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for recordkeeping services.

75.     As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the greatest benefit to plan participants.

76.     Well-known, industry-wide practices maintain that the share classes that provides the greatest benefit to plan participants are those that are the least costly based on total expense ratios net the revenue sharing that is rebated to participants, or the "net expense ratio."

77.     CapTrust, one of the largest providers of fiduciary services to retirement plan sponsors, specifically identifies on its website a fiduciary "pitfall" is "benchmarking only the total expense ratio" and failing to consider the net expense, i.e., "expense ratio minus revenue sharing" pointing out that, "what should be compared to other investment managers of that same asset class or category is expense ratio minus revenue sharing." *See* CapTrust Website, *Understanding and Evaluating Retirement Plan Fees/Part Two: Benchmarking Investment Fees*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-two-benchmarking-investment-fees/.

## Managed Account Service Fees

78.     During the Class Period, Defendants selected and made available to Plan participants managed account services through Fidelity's subsidiary, Strategic Advisors, Inc. ("SAI") called "Personalized Planning & Advice."

79.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his or her account in a portfolio of preselected investment options.

80.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

81.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

82.     In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

83.     Many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

84.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets may be charged a

certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

85.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

86.     For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers.

87.     Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

88.     The covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

89.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service at a much lower cost.

90.     As with recordkeeping services, prudent fiduciaries regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially similar services.

91.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

92.     Defendants caused WEC Energy Plan participants, including Plaintiff, to pay excessive fees for managed account services to SAI, which were "estimated not to exceed 0.60% per year of [a participant's] average daily managed account balance."

93.     Defendants could have reduced these fees charged by SAI by periodically soliciting bids from other managed account service providers and/or staying abreast of the market rates for managed account solutions to negotiate market rates, or by just offering target date funds instead.

94.     The excessive fees paid by Plan participants to SAI using the managed account service were not objectively reasonable and breached Defendants' fiduciary duties of prudence to Plaintiffs and other Class members, causing millions of dollars of lost retirement account funds.

## THE PLAN

95.     During the entire Class Period, the Plan received recordkeeping services from Fidelity and WEC Business.

96.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

97.     The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the WEC Energy Plan, regardless of the number or level of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

98.     It is clear based on the 5500 forms and 404(a)(5) participant disclosures that Fidelity and WEC Business did not provide any services at any higher level that were not

also part of the standard package of RKA services provided by all recordkeepers to mega plans.

99.     These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

100.     During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

101.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiffs and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

102.     A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

103.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

104.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

105. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

106. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

107. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

108. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

109. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

110. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

111.    Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

### PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

112.    A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

113.    During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Fidelity and WEC Business.

114.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Fidelity and WEC Business, in order to avoid paying unreasonable recordkeeping fees.

115.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Fidelity and WEC Business, and in light of the level and quality of recordkeeper services it received.

116.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RKA fees, illustrating that the Plan had on average 5,052 participants with account balances and paid an average effective annual RKA fee of at least approximately $744,288, which equates to

an average of at least approximately $147 per participant. These are the minimum amounts that could have been paid:

| | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 5,214 | 5,208 | 5,089 | 4,974 | 4,777 | *5,052* |
| Est. RKA Fees | $812,162 | $1,008,127 | $867,401 | $442,489 | $591,262 | *$744,288* |
| Est. RKA Per Participant | $156 | $194 | $170 | $89 | $124 | *$147* |

117.     After the fee reduction from 2017 through 2019, Plaintiffs did not notice any reduction in services nor did they receive any communications from Plan fiduciaries that a reduction in services was the cause of the fee reduction. In fact, the Plan communications received by Plaintiffs during this period highlighted service improvements.

118.     From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Assets | RKA Fee | RKA Fee /pp | Record-keeper | Graph Color |
|---|---|---|---|---|---|---|
| KDC USA 401(K) Plan | 2,443 | $50,530,969 | $118,206 | $48 | Fidelity | White |
| Owensboro Health 403(B) Safe Harbor Plan | 2,692 | $56,333,636 | $127,951 | $48 | Prudential | White |
| Associated Materials, LLC 401(K) Retire-ment Plan | 3,639 | $99,814,049 | $179,475 | $49 | ADP | White |
| Hitachi Vantara Cor-poration Retirement And Savings Pro-gram | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity | White |
| The Boston Consult-ing Group, Inc. Em-ployees' Profit Shar-ing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price | White |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |
| **WEC Plan Average Fee** | **5,052** | **$1,659,989,912** | **$744,288** | **$147** | **Fidelity** | **Red** |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Flowserve Corpora-tion Retirement Sav-ings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consult-ing Group, Inc. Em-ployees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Com-panies Inc. Retire-ment Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |

119. From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RKA fees paid by other comparable

plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



120.   From the years 2016 to 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual RKA fee of at least $143 per participant for RKA.

121.   As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

122.    When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL"), and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

123.    From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $41 per participant, if not lower.

124.    From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's participants the Plan actually would have paid significantly less than an average of approximately $744,288 per year in RKA fees, which equated to an effective average of approximately $147 per participant per year.

125.    From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately

$207,148 per year in RKA fees, which equates to approximately $41 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *more than three times* what they could otherwise pay for RKA.

126.     From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $537,140 per year in RKA fees, which equates to on average approximately $106 per participant per year.

127.     From the years 2016 to 2020, and because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,685,699 in unreasonable and excessive RKA fees.

128.     From the years 2016 to 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $3,970,810 in RKA fees.

129.     Defendants could have offered the exact same recordkeeping services, at the same level and quality, at a lower cost by using a different recordkeeper, but did not do so.

130.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts

must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services.

131.    **Defendants** failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Fidelity and WEC Business, and Defendants could have obtained the same recordkeeping services for less from other, similar recordkeepers.

132.    The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

133.    Plaintiffs paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to their Plan accounts as a result.

134.    Plaintiffs both have participated in several 401(k) plans from several employers and there have been no material differences in the services that they have received.

135.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity and WEC Business vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

136.    During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RKA fees it paid to Fidelity and WEC Business, but Defendants either simply failed to do so, or did so ineffectively given that it paid more than triple for RKA fees than it should have.

137. During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity and WEC Business, it would have realized that the Plan was compensating Fidelity and WEC Business unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and should have removed Fidelity and WEC Business as imprudent selections.

138. The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

139. The market for RKS services for mega plans, like the WEC Energy Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for RKA services and what he reasonable fair market fee was for identical services.

140. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity and WEC Business as Plan recordkeepers, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

141. For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

142. That accepted process involves evaluating the performance history, tenure, and stability, of the current portfolio manager, the risk adjusted returns, and the fees.

143. Although there is nothing inappropriate in having active investment options as a plan investment options, when an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

144. From the perspective of a plan participant, the other critical component of the analysis is the fees. The "total expense ratio" of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

145. As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for recordkeeping services as well as the different fee components of the investment options selected to be made available to plan participants.

146. Plan fiduciaries of plans as large as the Defendants' Plan are deemed to be "institutional investors" and have a higher level of knowledge of the different investment

share classes and the different components of fees within the total expense ratio of an investment option.

147.    In fact, as "institutional investors," retirement plans often have the ability to access investment options and service structures that are not available to retail investors such as individual plan participants like Plaintiffs.

148.    As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants.

<u>THE PLAN PAID UNREASONABLY HIGH FEES<br>FOR IMPRUDENT SHARE CLASSES</u>

149.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

150.    There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

151.    It is well known among institutional investors that mutual fund companies routinely waive investment minimums for large retirement plans, and they did so with the WEC Energy Plan.

152.    Mega defined contribution plans such as the WEC Energy Plan have sufficient assets to qualify for the lowest cost share classes.

153.    Unlike individual or retail investors, retirement plan fiduciaries have access to several different share classes.

154.    Choosing the share class that provides that provides the greatest benefit to plan participants is always the prudent choice because the use of the share class result in one of the following superior options: 1) the amount of the fee extraction to cover the record-keeping fee will be lower; or 2) the amount of excess revenue being credited back to participant accounts is greater.

155.    Defendants knew or should have known that they are required to select the share classes that provide the greatest benefit to plan participants.

156.    Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants in the form of the share class with lowest net expense ratio, considering revenue sharing used to pay for recordkeeping services.

157.    Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the lowest net expense ratio in numerous cases.

158.    The following charts identify Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to plan participants in the form of the lowest net expense ratio:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| FBAKX | Fidelity® Balanced K | 0.45% | 0.20% | 0.25% | FBALX | Fidelity® Balanced | 0.51% | 0.35% | 0.16% | 56% |
| FSNJX | Fidelity Freedom® 2005 K | 0.42% | 0.20% | 0.22% | FFFVX | Fidelity Freedom® 2005 | 0.47% | 0.35% | 0.12% | 83% |
| FSNKX | Fidelity Freedom® 2010 K | 0.44% | 0.20% | 0.24% | FFFCX | Fidelity Freedom® 2010 | 0.50% | 0.35% | 0.15% | 60% |
| FSNLX | Fidelity Freedom® 2015 K | 0.48% | 0.20% | 0.28% | FFVFX | Fidelity Freedom® 2015 | 0.54% | 0.35% | 0.19% | 47% |
| FSNOX | Fidelity Freedom® 2020 K | 0.51% | 0.20% | 0.31% | FFFDX | Fidelity Freedom® 2020 | 0.59% | 0.35% | 0.24% | 29% |
| FSNPX | Fidelity Freedom® 2025 K | 0.55% | 0.20% | 0.35% | FFTWX | Fidelity Freedom® 2025 | 0.63% | 0.35% | 0.28% | 25% |
| FSNQX | Fidelity Freedom® 2030 K | 0.58% | 0.20% | 0.38% | FFFEX | Fidelity Freedom® 2030 | 0.67% | 0.35% | 0.32% | 19% |
| FSNUX | Fidelity Freedom® 2035 K | 0.62% | 0.20% | 0.42% | FFTHX | Fidelity Freedom® 2035 | 0.72% | 0.35% | 0.37% | 14% |
| FSNVX | Fidelity Freedom® 2040 K | 0.65% | 0.20% | 0.45% | FFFFX | Fidelity Freedom® 2040 | 0.75% | 0.35% | 0.40% | 13% |
| FSNZX | Fidelity Freedom® 2045 K | 0.65% | 0.20% | 0.45% | FFFGX | Fidelity Freedom® 2045 | 0.75% | 0.35% | 0.40% | 13% |
| FNSBX | Fidelity Freedom® 2050 K | 0.65% | 0.20% | 0.45% | FFFHX | Fidelity Freedom® 2050 | 0.75% | 0.35% | 0.40% | 13% |
| FNSDX | Fidelity Freedom® 2055 K | 0.65% | 0.20% | 0.45% | FDEEX | Fidelity Freedom® 2055 | 0.75% | 0.35% | 0.40% | 13% |
| FNSFX | Fidelity Freedom® 2060 K | 0.65% | 0.20% | 0.45% | FDKVX | Fidelity Freedom® 2060 | 0.75% | 0.35% | 0.40% | 13% |
| FNSHX | Fidelity Freedom® Income K | 0.42% | 0.20% | 0.22% | FFFAX | Fidelity Freedom® Income | 0.47% | 0.35% | 0.12% | 83% |
| MIDLX | MFS International New Discovery R6 | 0.91% | 0.00% | 0.91% | MIDHX | MFS International New Discovery R3 | 1.29% | 0.50% | 0.79% | 15% |
| MEIKX | MFS Value R6 | 0.45% | 0.00% | 0.45% | MEIHX | MFS Value R3 | 0.80% | 0.50% | 0.30% | 50% |
| VRISX | Virtus KAR International Small Cap R6 | 1.06% | 0.00% | 1.06% | VISAX | Virtus KAR International Small-Cap A | 1.43% | 0.50% | 0.93% | 14% |
| | Average | 0.60% | 0.16% | 0.43% | | Average | 0.73% | 0.38% | 0.35% | 32.85% |

159.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by Fidelity.

160.    Based upon data and information reflected in the charts above, the excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the prudent alternative share class with the lowest net expense ratio was approximately 32.85%.

161. There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 33% higher than an alternative investment option that provides the *identical services* of the same portfolio manager.

162. Had Defendants engaged in an objectively reasonable search for, and selection of, the share class investments with the lowest net expense ratio, the Plan would have selected the alternative funds in the chart above.

163. Defendants knew, or should have known, about the existence of share class investments with the lowest net expense ratios and should have performed an analysis to determine the share class investments with the lowest net expense ratios.

164. Defendants selected a share class that resulted in higher fees to Plan participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's participants.

165. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these share class allegations are not about reasonable tradeoffs between differently managed investments. The higher cost share classes selected by Defendants were identical to share class investments with the lowest net expense ratio.

166. As an example, the MFS Value R6 (MEIKX), was selected by Plan fiduciaries and made available to participants in the Plan from 2016 through at least 2020.

167. As of December 31, 2020, Plan participants had invested more than $117,914,440 in this investment option. The portfolio managers of this investment option were Nevin P. Chitkara and Katherine A Cannan (Chitkara & Cannan). Plan participants

can receive the identical portfolio management services of Chitkara & Cannan through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Chitkara & Cannan, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
|---|---|---|
| | MFS Value R3 | MFS Value R6 |
| Share Class | R3 | R6 |
| Investment Advisor | Massachusetts Financial Services Company | Massachusetts Financial Services Company |
| Portfolio Managers | Nevin P. Chitkara and Katherine A Cannan | Nevin P. Chitkara and Katherine A Cannan |
| Ticker | MEIHX | MEIKX |
| Portfolio Management Fee | 0.44% | 0.44% |
| Total Expense Ratio | 0.80% | 0.45% |
| Revenue Sharing Credit | 0.50% | 0.00% |
| Net Investment Expense to Retirement Plans | 0.30% | 0.45% |

168. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by Fidelity.

169. In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RKA.

170. As a result, the fee paid for the portfolio management services of the portfolio managers Chitkara & Cannan to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

171.    The MFS Value R3 (MEIHX) has the lowest net investment expense at 0.30%. Despite the Total Expense Ratio being higher, the MFS Value R3 (MEIHX) provides the greatest benefit to Plan participants because the 0.50% in revenue sharing that is allocable to RKA services is a credit that is returned to the participants directly or used as a credit against the RKA fee. If the 0.50% allocable to RKA services exceeds the actual RKA fee, then the excess can also be returned to the Plan and its participants.

172.    During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of Chitkara & Cannan if invested in the MFS Value R3 (MEIHX).

173.    When two identical service options are readily available (in this case the portfolio management services of Chitkara & Cannan) and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary ensures that the least expensive of those options is selected.

174.    A prudent plan fiduciary understands that the higher "sticker" price of the RKA fee portion of the expense ratio is not relevant since the RKA service provider returns excess revenue to the Plan and its participants.

175.    The DOL requires plan fiduciaries to understand all the fees related to all the various services provided to the Plan and its participants. By selecting an investment option that charges more for identical portfolio management services, the Plan fiduciaries breached their duty of prudence.

176.    The industry standard is also clear when it comes to the lowest *net* expense ratio being the most prudent share class. CapTrust is "one of the largest providers of fiduciary services to retirement plan sponsors" and has "more than $660 billion in assets under

advisement as of September 30, 2021" with at least $300 billion of that being assets in retirement plans. *See* CAPTRUST WEBPAGE, https://www.captrust.com/captrust-announces-addi-tion-of-new-jersey-based-portfolio-evaluations-inc/.

177.     With regard to net expense ratios and share classes, CapTrust specifically identifies on its website a fiduciary "pitfall" is "benchmarking only the total expense ratio" and failing to consider the net expense, i.e., "expense ratio minus revenue sharing," pointing out that, "what should be compared to other investment managers of that same asset class or category is *expense ratio minus revenue sharing*." See CAPTRUST WEBPAGE, *Understanding and Evaluating Retirement Plan Fees/Part Two: Benchmarking Investment Fees*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-two-benchmarking-investment-fees/ (emphasis added.)

178.     A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class with the lowest net expense ratio, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

179.     During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into this prudent share class at the earliest opportunity.

180.     During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's

participants through 2020 in the amount of approximately $3,180,019 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Net Investment Expense to Retirement Plans | $2,841,548 | $3,552,895 | $3,154,472 | $4,163,357 | $5,244,660 | $5,244,660 |
| **Prudent Alternative Share Class** | | | | | | |
| Net Investment Expense to Retirement Plans | $2,520,601 | $3,163,394 | $2,828,040 | $3,899,636 | $4,969,440 | $4,969,440 |
| Est. Investment Damages | $320,947 | $389,502 | $326,432 | $263,721 | $275,220 | $275,220 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% |
| Est. Cumulative Investment Damages | $320,947 | $780,479 | $1,072,492 | $1,673,834 | $2,257,207 | $3,180,019 |

181.     By failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower net expense ratios to Plan participants were available for the same investments, Defendants breached their fiduciary duties of prudence to Plaintiffs and the Plan participants, causing them millions of dollars of retirement account losses during the Class Period.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

182.     Defendants retained Fidelity's wholly-owned subsidiary, Strategic Advisors, Inc. ("SAI"), to provide a managed account service through which SAI charged Plan participants a "Personalized Planning & Advice Fee."

183.     For this service, up through at least the end of 2020, Defendants have allowed Plan participants to pay an annual fee of 0.60% for all level investment fees, without employing a tiered structure of fees based on amount of assets.

184.     The table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services:

| Managed Account Service Fee Rates of Similarly-Situated Plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| WEC "Personalized Planning & Advice" | 0.60% | - | - |
| Verso Retirement Savings Plan for Bargained Employees (2021) | 0.25% | N/A | N/A |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

185.     As illustrated above, in all cases, the participants in the other comparator plans are paying fee rates at every tier lesser than Plan participants.

186.     A number of other managed account providers also exist whose services are virtually identical to the services provided to Plan participants through the "Personalized Planning & Advice" service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the WEC Energy Plan.

187.     The Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to WEC Energy, provided in 2020 managed account services through Fidelity to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

188.     The fee rates paid by the Plan participants for the WEC Energy Personalized Planning & Advice was excessive and objectively unreasonable given the Plan's size and negotiating power.

189.     Defendants could have offered the exact same managed account services at a

lower cost by using a different managed account provider or by utilizing a target date fund, but did not do so.

190.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

191.     Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

192.     The asset allocation created by the SAI was not materially different than the asset allocation of the age appropriate target date option made available to the Plan's participants at a much lower fee.

193.     As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better*

*Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

194.     As a result, based on the value provided, the reasonable fee for Plan's Personalized Planning and Advice was zero or very close to zero, and the use of the managed account services provided by SAI cost the Plan hundreds of thousands of dollars of wasted managed account service provider fees:

| Strategic Advisors, Inc. - Schedule C - Direct Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| STRATEGIC ADVISORS, INC | $0 | $111,964 | $163,842 | $185,949 | $151,193 | $612,948 |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | |
| Estimated Cumulative Damages | $0 | $111,964 | $270,868 | $542,087 | $793,078 | |

195.     Defendants did not prudently evaluate the incremental value provided by the Plan's Personalized Planning and Advice service to determine that these fees were warranted.

196.     A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiffs and Plan participants would not have paid the excessive managed account service fees that they did.

197.     Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

198.     Defendants' failure to properly monitor or control fees for the Plan's managed

account service cost resulted in Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the fiduciary duty of prudence, and cost Plaintiffs and Plan participants who used the services hundreds of thousands of dollars of harm to their retirement accounts.

## DEFENDANTS' INVESTMENTS IN THE PLAN

199. A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

200. While higher-cost mutual funds may outperform a less-expensive option over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, THE WASHINGTON POST, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index Funds Trounce Actively Managed Funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("[L]ong-term data suggests that actively managed funds 'lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.'")

201. Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873

(2009); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio.")

## THE PLAN'S INVESTMENT IN THE FIDELITY FREEDOM FUNDS

202.    The Plan offers a suite of thirteen (13) target date funds. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.

203.    All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's "glide path." The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

204.    According to the Plan's Form 5500s, from at least December 31, 2014 through the present, the Plan offered Fidelity Freedom target date funds. Fidelity Management & Research ("FMRC") is the second largest target date fund provider by total assets. The Fund's target date offerings consist of the Fidelity Freedom Fund Class K6 (the "Active suite".) The Plan does not offer the substantially less costly, substantially identical, Fidelity Freedom Index Funds (the "Index suite").

205.    Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. Defendants failed to compare the Active and Index suites and consider their respective merits and features. A simple weighing of the benefits of the two suites indicates

that the Index suite is and has been a far superior option from a combined cost and performance perspective, and consequently the more appropriate choice for the Plan.

206.     Defendants failed to act in the sole interest of Plan Participants and breached their fiduciary duty by imprudently selecting and retaining the Active suite for the Class Period.

207.     The two fund families have nearly identical names and share a management team.  But while the Active suite invests predominantly in actively managed Fidelity mutual funds, the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices.

208.     The Active suite is dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy. Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

## THE ACTIVE SUITE IS HIGH-RISK AND UNSUITABLE FOR PLAN PARTICIPANTS

209.     The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan.

210.     Although the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, the Active suite subjects its assets to significantly more risk than the Index suite. At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily

features funds with a manager deciding which securities to buy and sell, and in what quantities.

211.    These extra costs present an additional hurdle for active managers to clear to provide value and compensate investors for the added risk resulting from their decision-making. Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."

212.    Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market. The Active suite's allocation to primarily actively managed funds subjects investors to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

213.    The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

214.    This chart only considers the mix of the portfolio at the level of stocks, bonds, and cash. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite. The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

215. Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction. In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts to locate underpriced securities.

216. This strategy heaps further unnecessary risk on investors, such as Plan Participants, in the Active suite. A March 2018 Reuters special report on the Fidelity Freedom funds details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."

217. The flow of funds to, or from, target date families constitute one indicator of the preferences of investors at large. According to Morningstar's report on the 2019 Target Date Fund Landscape, *see* MORNINGSTAR, *2019 Target-Date Fund Landscape: Simplifying the Complex*, available at https://www.morningstar.com/lp/tdf-landscape, investor demand for low-cost target date options has skyrocketed in recent years.

218. The Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows. The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years.

219.    Defendants' act, in offering and maintaining the Active suit in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

220.    Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on." This measurement emphatically favors the Index suite.

221.    Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund (other than the 2055 Index Fund, which has the same 4 stars as the 2055 Active Fund). With the exception of the 2020, 2055, and 2060 iterations (each 4 stars), the full Index suite is assigned 5 stars, Morningstar's highest rating. The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers. The Active suite does not achieve a single 5-star rating.

222.    Defendants were likely aware, or should have been aware, of the higher ratings of the Index suite, yet continued to offer the Active suite, to the detriment of Plan participants.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| **Freedom Suite** | **Ticker** | **Stars** | **Freedom Index Suite** | **Ticker** | **Stars** |
| Income K | FNSHX | 4 | Income Inst Prem | FFGZX | 5 |
| 2005 K | FSNJX | 4 | 2005 Inst Prem | FFGFX | 5 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 3 | 2020 Inst Prem | FIWTX | 4 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 4 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 4 | 2035 Inst Prem | FFEZX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 4 | 2055 Inst Prem | FFLDX | 4 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

223.     During the Class Period, the chart below identifies several investment options that Defendants selected, including the Fidelity Freedom Active suite, and/or made available to Plan Participants as compared to prudent alternative and less expensive options (both active and passive.)

| Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| QISCX | Federated MDT Small Cap Core Instl | 0.89% | 0.35% | 0.54% | FSSNX | Fidelity® Small Cap Index | 0.03% | 0.00% | 0.03% | 2060% |
| FBAKX | Fidelity® Balanced K | 0.45% | 0.20% | 0.25% | VBAIX | Vanguard Balanced Index I | 0.06% | 0.00% | 0.06% | 317% |
|  | Fidelity Diversified International CCTF | 0.58% | 0.00% | 0.58% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.16% | 0.00% | 0.16% | 263% |
| FITKX | Fidelity Freedom® 2005 K6 | 0.37% | 0.00% | 0.37% | FFGFX | Fidelity Freedom® Index 2005 Instl Prem | 0.08% | 0.00% | 0.08% | 363% |
| FOTKX | Fidelity Freedom® 2010 K6 | 0.38% | 0.00% | 0.38% | FFWTX | Fidelity Freedom® Index 2010 Instl Prem | 0.08% | 0.00% | 0.08% | 375% |
| FPTKX | Fidelity Freedom® 2015 K6 | 0.40% | 0.00% | 0.40% | FIWFX | Fidelity Freedom® Index 2015 Instl Prem | 0.08% | 0.00% | 0.08% | 400% |
| FATKX | Fidelity Freedom® 2020 K6 | 0.42% | 0.00% | 0.42% | FIWTX | Fidelity Freedom® Index 2020 Instl Prem | 0.08% | 0.00% | 0.08% | 425% |
| FDTKX | Fidelity Freedom® 2025 K6 | 0.44% | 0.00% | 0.44% | FFEDX | Fidelity Freedom® Index 2025 Instl Prem | 0.08% | 0.00% | 0.08% | 450% |
| FGTKX | Fidelity Freedom® 2030 K6 | 0.46% | 0.00% | 0.46% | FFEGX | Fidelity Freedom® Index 2030 Instl Prem | 0.08% | 0.00% | 0.08% | 475% |
| FWTKX | Fidelity Freedom® 2035 K6 | 0.48% | 0.00% | 0.48% | FFEZX | Fidelity Freedom® Index 2035 Instl Prem | 0.08% | 0.00% | 0.08% | 500% |
| FHTKX | Fidelity Freedom® 2040 K6 | 0.50% | 0.00% | 0.50% | FFIZX | Fidelity Freedom® Index 2040 Instl Prem | 0.08% | 0.00% | 0.08% | 525% |
| FJTKX | Fidelity Freedom® 2045 K6 | 0.50% | 0.00% | 0.50% | FFOLX | Fidelity Freedom® Index 2045 Instl Prem | 0.08% | 0.00% | 0.08% | 525% |
| FZTKX | Fidelity Freedom® 2050 K6 | 0.50% | 0.00% | 0.50% | FFOPX | Fidelity Freedom® Index 2050 Instl Prem | 0.08% | 0.00% | 0.08% | 525% |
| FCTKX | Fidelity Freedom® 2055 K6 | 0.50% | 0.00% | 0.50% | FFLDX | Fidelity Freedom® Index 2055 Instl Prem | 0.08% | 0.00% | 0.08% | 525% |
| FVTKX | Fidelity Freedom® 2060 K6 | 0.50% | 0.00% | 0.50% | FFLEX | Fidelity Freedom® Index 2060 Instl Prem | 0.08% | 0.00% | 0.08% | 525% |
| FFSZX | Fidelity Freedom® 2065 K6 | 0.50% | 0.00% | 0.50% | FFIKX | Fidelity Freedom® Index 2065 Instl Prm | 0.08% | 0.00% | 0.08% | 525% |
| FYTKX | Fidelity Freedom® Income K6 | 0.37% | 0.00% | 0.37% | FFGZX | Fidelity Freedom® Index Inc Instl Prem | 0.08% | 0.00% | 0.08% | 363% |
|  | Fidelity Growth Company CCTF | 0.38% | 0.00% | 0.38% | FSPGX | Fidelity® Large Cap Growth Idx | 0.04% | 0.00% | 0.04% | 986% |
|  | Fidelity Low-Priced Stock CCTF | 0.48% | 0.00% | 0.48% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 0.00% | 0.07% | 586% |
| FSCRX | Fidelity® Small Cap Discovery | 0.61% | 0.35% | 0.26% | FSSNX | Fidelity® Small Cap Index | 0.03% | 0.00% | 0.03% | 940% |
| MIDLX | MFS International New Discovery R6 | 0.91% | 0.00% | 0.91% | DISMX | DFA International Small Cap Growth | 0.47% | 0.00% | 0.47% | 94% |
| MEIKX | MFS Value R6 | 0.45% | 0.00% | 0.45% | FLCOX | Fidelity® Large Cap Value Index | 0.04% | 0.00% | 0.04% | 1186% |
| | Average | 0.50% | 0.04% | 0.46% | | Average | 0.09% | 0.00% | 0.09% | 587.72% |

224.     During the Class Period and based on the charts above, the average net expense ratio of the investments selected and made available to Plan Participants by the Plan fiduciaries identified above was 0.51%, or 51 basis points.

225.     During the Class Period and based on the charts above, the investment options selected by the Plan fiduciaries were 587.72% more expensive than prudent alternative and less expensive options covering the same asset category and same investment approach.

226.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.

227.     The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of Participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



228.     During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, Plaintiffs and the Plan's participants incurred unnecessary and substantial expenses and costs.

229.     During the Class Period and had Defendants acted in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives.

230.     During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Plan's participants in the amount of approximately $27,136,514 through 2021 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Net Investment Expense to Retirement Plans | $2,761,383 | $3,430,343 | $3,053,774 | $4,024,370 | $4,922,905 | $4,922,905 |

| Prudent Alternative Investments | | | | | | |
|---|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $785,774 | $917,618 | $821,858 | $977,352 | $1,162,240 | $1,162,240 |
| Est. Investment Damages | $1,975,609 | $2,512,724 | $2,231,917 | $3,047,018 | $3,760,665 | $3,760,665 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% |
| Est. Cumulative Investment Damages | $1,975,609 | $4,919,411 | $6,934,382 | $12,164,343 | $18,164,464 | $27,136,514 |

231.   Alternatively, during the Class Period, the chart below compares the Fidelity Freedom Active suite to a more prudent, apples-to-apples active target date suite, the American Funds Target Date Suite, which was available to the Plan:

| Fidelity Freedom Funds - K6 | | | | | American Funds Target Date - R6 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| FOTKX | Fidelity Freedom® 2010 K6 | 0.38% | 0.00% | 0.38% | RFTTX | American Funds 2010 Trgt Date Retire R6 | 0.28% | 0.00% | 0.28% | 36% |
| FPTKX | Fidelity Freedom® 2015 K6 | 0.40% | 0.00% | 0.40% | RFJTX | American Funds 2015 Trgt Date Retire R6 | 0.29% | 0.00% | 0.29% | 38% |
| FATKX | Fidelity Freedom® 2020 K6 | 0.42% | 0.00% | 0.42% | RRCTX | American Funds 2020 Trgt Date Retire R6 | 0.30% | 0.00% | 0.30% | 40% |
| FDTKX | Fidelity Freedom® 2025 K6 | 0.44% | 0.00% | 0.44% | RFDTX | American Funds 2025 Trgt Date Retire R6 | 0.31% | 0.00% | 0.31% | 42% |
| FGTKX | Fidelity Freedom® 2030 K6 | 0.46% | 0.00% | 0.46% | RFETX | American Funds 2030 Trgt Date Retire R6 | 0.33% | 0.00% | 0.33% | 39% |
| FWTKX | Fidelity Freedom® 2035 K6 | 0.48% | 0.00% | 0.48% | RFFTX | American Funds 2035 Trgt Date Retire R6 | 0.35% | 0.00% | 0.35% | 37% |
| FHTKX | Fidelity Freedom® 2040 K6 | 0.50% | 0.00% | 0.50% | RFGTX | American Funds 2040 Trgt Date Retire R6 | 0.36% | 0.00% | 0.36% | 39% |
| FJTKX | Fidelity Freedom® 2045 K6 | 0.50% | 0.00% | 0.50% | RFHTX | American Funds 2045 Trgt Date Retire R6 | 0.37% | 0.00% | 0.37% | 35% |
| FZTKX | Fidelity Freedom® 2050 K6 | 0.50% | 0.00% | 0.50% | RFITX | American Funds 2050 Trgt Date Retire R6 | 0.37% | 0.00% | 0.37% | 35% |
| FCTKX | Fidelity Freedom® 2055 K6 | 0.50% | 0.00% | 0.50% | RFKTX | American Funds 2055 Trgt Date Retire R6 | 0.38% | 0.00% | 0.38% | 32% |
| FVTKX | Fidelity Freedom® 2060 K6 | 0.50% | 0.00% | 0.50% | RFUTX | American Funds 2060 Trgt Date Retire R6 | 0.38% | 0.00% | 0.38% | 32% |
| | Average | 0.46% | 0.00% | 0.46% | | Average | 0.34% | 0.00% | 0.34% | 36.77% |

232.     The choice of the Fidelity Freedom Funds Active Suite over the American Funds cost Plaintiffs and the Class millions of dollars as illustrated in the following table:

| Fidelity Freedom Funds vs. American Funds Target Date Funds | | | | | | |
|---|---|---|---|---|---|---|
| **Fidelity Freedom Funds** | | | | | | |
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| Net Investment Expense to Retirement Plans | $2,761,383 | $3,430,343 | $3,053,774 | $4,024,370 | $4,922,905 | $4,922,905 |
| **American Funds Target Date Funds** | | | | | | |
| Net Investment Expense to Retirement Plans | $2,697,111 | $3,338,241 | $2,961,525 | $3,709,979 | $4,551,211 | $4,551,211 |
| Est. Investment Damages | $64,272 | $92,102 | $92,249 | $314,391 | $371,694 | $371,694 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% |
| Est. Cumulative Investment Damages | $64,272 | $170,398 | $255,133 | $649,840 | $1,141,169 | $1,840,264 |

233.     During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its target date investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Class, which breached their fiduciary duty of prudence under ERISA.

## SELF DEALING

234.     WEC Energy is a fiduciary to the Plan because it exercises discretionary authority, responsibility, and control over the management and administration of the Plan and exercises authority and control over Plan assets.

235.     Based on publicly available DOL 5500 Forms, WEC Energy paid itself, through its wholly-owned subsidiary, WEC Business Services LCC, for providing RKA services to the Plan.  Specifically, based on information provided by WEC Energy in its 5500 filings, the following amounts were paid out of plan assets to WEC Business from 2016 through 2020:

| WEC Business Services LLC - Schedule C - Direct Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| WEC BUSINESS SERVICES LLC | $0 | $233,529 | $182,316 | $212,846 | $319,261 | $947,952 |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | |
| Estimated Cumulative Damages | $0 | $233,529 | $405,546 | $746,058 | $1,202,669 | |

236.     The services purportedly provided to the Plan by WEC Business did not provide any value to the Plan, and did not warrant the payment of the fees to WEC Business.

237.     The RKA services purportedly provided to the Plan by WEC Business are standard RKA services that were provided already by the Plan's recordkeeper, Fidelity.

238.     WEC Energy's payment of these fees to itself out of plan assets represents self-dealing and a clear conflict of interest with the Plan and Plan participants and violates the duty of loyalty it owes to Plan Participants under ERISA Section 404(a)(1)(A); 29 U.S.C. § 1104(a)(1)(4).

239.     The payments to itself of these RKA fees also constitute a fiduciary prohibited transaction by WEC Energy as a fiduciary to the Plan. ERISA Section 406(b), 29 U.S.C. §1106(b)(1).

240.     WEC Energy is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. ERISA Section 409(a), 29 U.S.C. §1109(a).

## FAILURE TO USE STABLE VALUE FUND

241.     The Plan provides the Fidelity Investments Money Market Government Portfolio Institutional Class in place of a more traditional stable value fund investment option

for its "Short-Term asset class," according to the required fee disclosures provided to Plan participants under ERISA Section 404(a)(5), 29 U.S.C. § 1104(a)(5).

242.    Stable value funds are fairly common in 401(k) plans. In most cases, stable value products make use of special contracts known as "GICs" or "wraps" that have their own risk and return characteristics. Stable value funds generally are not mutual funds and usually are structured as an insurance company general account, an insurance company separate account, or a synthetic account.

243.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides liquidity and principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time.  It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.

244.    Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.

245.    As an ERISA fiduciary, WEC Energy had an obligation to monitor the fees and performance of the Fidelity Money Market Fund and to remove or replace it where a substantially identical investment option could be obtained from the same or similar provider

at a lower cost. *See, e.g., Tibble v. Edison Intl*, 843F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected.")

246.    To take advantage of this bargaining power, WEC Energy should have submitted requests for proposal ("RFPs") to stable value fund providers approximately every three years. Products from any number of providers were available with better products, lower fees, and higher crediting rates than the Fidelity Money Market Fund.

247.    Other employers with 401(k) plans with fixed income assets of an even smaller size than WEC Energy bid out their short term asset funds and obtained better products.

248.    The Fidelity Money Market fund was an imprudent investment and should have been removed from the Plan. It was imprudent for the Plan to select a money market fund when it could have provided the same liquidity protection while generating greater returns with a stable value fund like most mega Plans have.

249.    Because this money market investment was not removed from the Plan in a timely manner, Defendants breached their fiduciary duty of prudence, causing Plaintiff and Plan participants millions of dollars of losses to their retirement accounts as shown in the following chart and graph:

| Plan Year | Fidelity Money Market Government Portfolio - Return (%) | Morningstar Stable Value Index (%) | Difference (%) | Assets ($) | Estimated Damages ($) |
|---|---|---|---|---|---|
| 2016 | 0.29% | 1.79% | 1.50% | $26,344,825 | $395,172 |
| 2017 | 0.79% | 1.96% | 1.17% | $23,516,209 | $275,140 |
| 2018 | 1.75% | 2.23% | 0.48% | $27,482,678 | $131,917 |
| 2019 | 2.13% | 2.51% | 0.38% | $26,557,864 | $100,920 |
| 2020 | 0.38% | 2.24% | 1.86% | $33,975,454 | $631,943 |
| | | | | Total Estimated Damages ($): | $1,535,092 |



250.    WEC Energy is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been properly invested in a stable value product. ERISA Section 409(a), 29 U.S.C. § 1109(a).

## CLASS ACTION ALLEGATIONS

251.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

252.    In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the WEC Energy Group Employee Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 10, 2016 and running through the date of judgment.

253.    The Class includes approximately 5,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

254.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty;

d.    Whether Defendants engaged in a fiduciary prohibited transaction when it engaged in self-dealing; and

e.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty and engaging in prohibited transactions.

255.    Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

256.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

257.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

258.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

259.     Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

260.     The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and do not involve mismanagement of individual accounts.

261.     The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

262.     Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

263.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

<u>FIRST CLAIM FOR RELIEF</u>
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against Defendants –**
<u>Recordkeeping Fees)</u>

264.     Plaintiffs restate the above allegations as if fully set forth herein.

265. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

266. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

267. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

268. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

269. During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

270. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

271. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

272. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

273. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

274. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

275. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the WEC Energy Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

`                    SECOND CLAIM FOR RELIEF**
**Breaches of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against Defendants –
Investment Management Fees)**

276.     Plaintiffs restate the above allegations as if fully set forth herein.

277.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or

1102(a)(1).

278.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defend-

ants in managing the investments, including share classes, target date funds, and short-

term asset funds, of the Plan.

279.     Defendants, as fiduciaries of the Plan, are responsible for selecting prudent

investment options, ensuring that those options charge only reasonable fees, and taking any

other necessary steps to ensure that the Plan's assets are invested prudently.

280.     During the Class Period, Defendants had a fiduciary duty to do all of the fol-

lowing: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants

and beneficiaries; defray reasonable expenses of administering the Plan; and act with the

care, skill, diligence, and prudence required by ERISA.

281.     During the Class Period, Defendants breached their fiduciary duties of pru-

dence to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan

for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable

expenses of administering the Plan, act with the care, skill, diligence, and prudence required

by ERISA.

282.     Defendants, as fiduciaries of the Plan, had a continuing duty to regularly mon-

itor and independently assess whether the Plan's investments were prudent choices for the

Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

283.     During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiffs, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

284.     Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

285.     Defendants failed to employ a prudent process by failing to evaluate the cost and performance of the Plan's investments and fees critically or objectively in comparison to other more reasonable investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses and low performance relative to other investment options that were readily available to the Plan at all relevant times.

286.     Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

287.     As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

288.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against Defendants –
Managed Account Service Fees)**

289.     Plaintiffs restate the above allegations as if fully set forth herein.

290.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

291.     29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendants in their administration of the Plan. Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

292.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

293. During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

294. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

295. During the Class Period, Defendants breached its duty to Plan participants, including Plaintiffs, by failing to employ a prudent process by failing to evaluate the cost of the Plan's managed account provider critically or objectively in comparison to other managed account options, or in comparison to less costly target-date funds.

296. Defendants' failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

297. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs, and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

298.     Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

<u>FOURTH CLAIM FOR RELIEF</u>
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against Defendants**
**– Recordkeeping Fees)**

299.     Plaintiffs restates the above allegations as if fully set forth herein.

300.     Defendants had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

301.     In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan recordkeeping fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

302.     Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

303. The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

    b.    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c.    Failing to remove individuals responsible for Plan recordkeeping fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Fidelity and WEC Business as recordkeepers at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

304. As the consequences of the breaches of the duty to monitor for recordkeeping fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

305. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the WEC Energy Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FIFTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended (Plaintiffs, on behalf of themselves and Class, Against Defendants – Investment Management Fees)

306. Plaintiffs restate the above allegations as if fully set forth herein.

307.     Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

308.     In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

309.     Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

310.     The objectively unreasonable and excessive investment management fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

b.     Failing to monitor the process by failing to investigate the availability of more reasonably-priced investment management fees; and

c.     Failing to remove individuals responsible for Plan investment management fees whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining those share classes,

target date funds, and short-term asset funds, was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

311. As the consequences of the foregoing breaches of the duty to monitor for investment management fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

312. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the WEC Energy Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## SIXTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Plaintiff, on behalf of themselves and Class, Against Defendants
### – Managed Account Fees)

313. Plaintiffs restate the above allegations as if fully set forth herein.

314. Defendants had the authority to appoint and remove members or individuals responsible for Plan managed account fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

315. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan managed account fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

316. Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial

resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

317. The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

    b.    Failing to monitor the process by which the Plan's managed account service provider was evaluated and failing to investigate the availability of more reasonably-priced managed account providers; and

    c.    Failing to remove individuals responsible for Plan managed account fees whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining SAI as the managed account provider at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

318. As the consequences of the foregoing breaches of the duty to monitor for managed account fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

319. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the WEC Energy Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## SEVENTH CLAIM FOR RELIEF
### Fiduciary Prohibited Transactions under ERISA, as Amended,
### And Breach of Duty of Loyalty of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class – Defendant WEC Energy Self-Dealing)

320.     Under ERISA Section 404(a)(1)(A), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

321.     Under ERISA Section 406(b)(1), "[a] fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

322.     Defendant WEC Energy, as fiduciary to the Plan, did not discharge its duties with respect to the Plan solely in the interest of Plan participant benefits and for the exclusive purpose of providing benefits to participants and their beneficiaries, instead engaging in self-dealing and unlawfully paying itself from plan assets, through its subsidiary WEC Business, for RKA services that were already being provided by Fidelity.

323.     The RKA fee charged by Fidelity is even more unreasonable because WEC Business was providing services that would typically be provided as part of the record-keeper's service offerings. The reasonable RKA fee that the Plan should have paid for RKA should have been reduced by the dollar amounts paid to WEC Energy since WEC Energy was purportedly providing some of the RKA services typically provided by the Plan's record-keeper.

324.     Defendant WEC Energy dealt with the assets of the Plan in its own interest and for its own account by diverting plan assets to itself instead of using the plan assets for the exclusive benefit of Plan participants. ERISA Section 406(b)(1); 29 U.S.C. §1106(b)(1).

325.     The payments to itself through its subsidiary, WEC Business, for purported RKA purposes constitutes a fiduciary prohibited transaction by WEC Energy as a fiduciary to the Plan because WEC Energy dealt with the assets of the plan for its own interest and for its own account through its subsidiary, WEC Business.

326.     WEC Energy is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a); *Barboza v. California Assn. of Prof. Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 750 (6th Cir. 2014).

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping, man-

aged account, and investment management costs, and for engaging in self-dealing, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring WEC Energy to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against WEC Energy as necessary to effectuate relief, and to prevent WEC Energy' unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Dated this 10th day of May, 2022

s/ Paul M. Secunda
James A. Walcheske, WI Bar No. 1065635
Scott S. Luzi, WI Bar No. 1067405
Paul M. Secunda, WI Bar No. 1074127
WALCHESKE & LUZI, LLC
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs*
