**CONFIDENTIAL**

**EXHIBT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | |
|---|---|
| JONATHAN MUNT, GLORIA J. HARMON, and SANDRA M. WINGERS, individually, and as Representatives of a Class of Participants and Beneficiaries of the WEC Energy Group Employee Retirement Savings Plan, | |
| Plaintiffs, | Case No. 2:22-cv-00555-JPS |
| v. | CLASS ACTION THIRD AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. § 1132(a)(2) |
| WEC ENERGY GROUP, INC. | |
| and | |
| WISCONSIN ENERGY INVESTMENT TRUST POLICY COMMITTEE, | |
| Defendants | |

---

COMES NOW Plaintiffs, Jonathan Munt, Gloria J. Harmon, and Sandra M. Wingers, individually and as representatives of a Class of Participants and Beneficiaries of the WEC Energy Group Employee Retirement Savings Plan (the "Plan" or "WEC Energy Plan"), by their counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2. The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3. The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4. Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5. Defendants, WEC Energy Group, Inc. ("WEC Energy") and the Wisconsin Energy Investment Trust Policy Committee ("ITPC" or "Committee Defendants") (collectively,

"Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as WEC Energy Group Employee Retirement Savings Plan (the "Plan" or "WEC Energy Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (May 10, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative ("RKA")] fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Fidelity Investments Institutional ("Fidelity").

7. Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by "offer[ing] needlessly expensive investment options," in the form of target-date funds (Fidelity Freedom Fund Active Suite) and other funds. *See Hughes*, 142 S. Ct. at 740.

8. These objectively unreasonable RKA and investment fees and costs cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9. Defendants breached their fiduciary duty of prudence by offering higher-cost investments to the Plan's participant when it could have offered the same investment opportunities less expensively and by causing the Plan participants to pay excessive RKA fees.

10. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees and costs for Plan RKA and investments.

11. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees, as well as selecting and retaining investments, based on what is *reasonable* (not the cheapest or average) in the applicable market.

3

12.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

13.     The unreasonable RKA fees paid, as well as the unreasonable selection and retention of Plan investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

14.     These breaches of fiduciary duty caused Plaintiffs and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and funds.

15.     To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

<u>JURISDICTION AND VENUE</u>

16.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

19.     In conformity with 29 U.S.C. §1132(h), Plaintiffs served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

20. Plaintiff, Jonathan Munt, is a resident of the State of Wisconsin and currently resides in Burlington, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

21. Plaintiff Munt has been a Plant Electrician at the Valley Power Plant location of WEC Energy in Milwaukee, Wisconsin, from 2006 to the present. He currently is, or has been, invested in the following Plan investments: Fidelity Low PR Stock Pool Large Cap, Fidelity 500 Index, Fidelity Growth Commingled Pool, Fidelity Growth Commingled Pool CL 2 Company, WEC Common Stock ESOP, Fidelity Inflation PR Bond Index, and Fidelity Balanced K.

22. Plaintiff, Gloria J. Harmon, is a resident of the State of Wisconsin and currently resides in Glendale, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

23. Plaintiff Harmon was an Energy Service Consultant at the Green Bay Road location of WEC Energy in Milwaukee, Wisconsin, from 1980 to 2020. She currently is invested, or has been invested, in the following Plan investments: Fidelity Freedom Fund 2020 K6, Fidelity Freedom Fund 2025 K6, WEC Common Stock ESOP, and Fidelity Balanced K.

24. Plaintiff, Sandra M. Wingers, is a resident of the State of Wisconsin and currently resides in Glendale, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

25. Plaintiff Wingers most recently has been a Generation Storeroom Specialist at the Valley Power Plant location of WEC Energy in Milwaukee, Wisconsin, from 1998 to the present. She currently is invested, or has been invested, in the following Plan investments: Fidelity Balanced Fund Class K, Fidelity International Index Fund, Federated Hermes MDT Small Cap Core Fund Institutional Class, Fidelity Mid-Cap Index Fund, Fidelity Low-

Priced Stock Commingled Pool, Fidelity Growth Company Commingled Pool Class 2, Blended Rate Income Fund ("BRIF"), Fidelity U.S. Bond Index Fund, Fidelity Inflation-Protected Bond Index Fund, and WEC Common Stock ESOP.

26. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan account through paying excessive RKA ees, and by holding, among other investments, the Fidelity Freedom Fund and other challenged funds during the Class Period, those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Fidelity as its recordkeeper and in Defendants selecting and maintaining those funds, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiffs and Class.

27. Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries, including for investments they did not hold.

28. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA and investment fees and costs) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

29. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

30. WEC Energy Group, Inc. ("WEC Energy") is one of the nation's largest electric generation and distribution and natural gas delivery holding companies. WEC Energy provide energy services to more than 4.6 million customers in Wisconsin, Illinois, Michigan,

6

and Minnesota. Its United States headquarters are located at 231 W. Michigan Street, Milwaukee, WI 53203. In this Complaint, "WEC Energy" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

31.     WEC Energy acted through its officers to perform Plan-related fiduciary functions involving RKA services and investments, in the course and scope of their business. WEC Energy, through its CEOs, appointed other Plan fiduciaries on the ITPC, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees who were involved with RKA services and investments. For these reasons, WEC Energy is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

32.     WEC Energy and the ITPC are the Plan Administrators for purposes of RKA and investment functions. As the Plan Administrator, WEC Energy and the ITPC are fiduciaries with day-to-day administration and operation of the Plan when it comes to RKA and investment decisions under 29 U.S.C. § 1002(21)(A). WEC Energy and the ITPC have authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities involving recordkeeping, administrative, and investment functions.

33.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that WEC Energy' contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

34.     In 2020, the Plan had about $1,853,141,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees

and expenses. Defendants, however, did not regularly monitor Fidelity to ensure that Fidelity, and the Plan investments and services selected, remained the prudent and objectively reasonable choices.

35.    With 4,974 participants in 2019, the Plan had more participants than 99.61% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,853,141,000 in assets in 2019, the Plan had more assets than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Other years during the Class Period for participant and asset ranks are as follows.

| Year | Participants | Participant Rank | Assets | Asset Rank |
|------|-------------|------------------|--------|------------|
| 2014 | 5,433 | 99.68% | $1,508,268,000 | 99.90% |
| 2015 | 5,361 | 99.66% | $1,470,043,000 | 99.91% |
| 2016 | 5,214 | 99.64% | $1,553,016,000 | 99.91% |
| 2017 | 5,208 | 99.64% | $1,751,332,000 | 99.91% |
| 2018 | 5,089 | 99.62% | $1,570,580,000 | 99.91% |
| 2019 | 4,974 | 99.61% | $1,853,141,000 | 99.91% |
| 2020 | 4,777 | 99.61% | $2,032,086,000 | 99.91% |

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

36.    Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan.

37.    Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

38.    Although WEC Energy contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions

are irrelevant to whether a Plan has paid excessive plan recordkeeping or investment fees and costs.

39. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

40. Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

41. Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

### Recordkeeping and Administrative (RKA) Services

42. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Fidelity is one such recordkeeper.

43. These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the materially same level and quality.

44. There are three types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled

RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The Bundled RKA services include, but are not limited to, the following standard services:

a. Recordkeeping;

b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e. Maintenance of an employer stock fund (if needed);

f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

45.     Based on the Plan's 408(b)(2) sponsor disclosures and the relevant sections of the administrative service agreement between WEC Energy and Fidelity, ████████████ ███████████████████████████████████████████████████.

46.     The second type of essential RKA services, hereafter referred to as "A La Carte" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

47.     These "A La Carte" services typically include, but are not limited to, the following:

     a.     Loan processing;

     b.     Brokerage services/account maintenance;

     c.     Distribution services; and

     d.     Processing of Qualified Domestic Relations Orders (QDROs).

48.     Based on the Plan's 408(b)(2) sponsor disclosures and the relevant sections of the administrative service agreement between WEC Energy and Fidelity, ████████████ █████████████████████████████████████████████████.

49.     The third type of RKA fees are "Ad Hoc" fees with include transaction fee and other administrative fees, which include such things as ESOP fees, fees for service, and terminated maintenance fees.

50.     Based on the Plan's 408(b)(2) sponsor disclosures and the relevant sections of the administrative service agreement between WEC Energy and Fidelity, ████████████ ██████████████████████████████.

51.     For mega plans, like the WEC Energy Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

52. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

53. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific record-keeper are apples-to-apples comparisons.

54. Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the RKA fee rates proposed by recordkeepers.

55. Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they re-quest that the Bundled RKA revenue requirement be expressed as either a flat per partici-pant fee rate or an asset-based fee rate, or both.

56. While there may be minor differences in *how* the Bundled RKA services are delivered, those differences are immaterial to the price comparisons in virtually all cases.

57. Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment educa-tion sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

58. The WEC Energy Plan had a standard package of Bundled RKA services, providing RKA services of a materially similar level and quality to other recordkeepers who service other mega plans.

59. There is nothing disclosed in the Participant section 408(b)(2), administrative service agreement, or section 404(a)(5) documents, that suggests that the annual RKA fees

charged to participants included any services that were unusual or above and beyond the standard recordkeeping provided by all national recordkeepers to mega plans.

60. Accordingly, the disparity between the Plan's RKA fees, and the RKA fees paid by several other similarly sized plans for the materially similar standard bundle of RKA services, cannot be explained by any additional services, or the quality of those services, provided by Fidelity to the Plan.

61. Because recordkeepers offer materially similar bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

62. Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

63. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the WEC Energy Plan. In other words, reasonable RKA fees paid in 2018 are reflective of reasonable RKA fees during the entire Class Period.

64. The underlying cost to a recordkeeper of providing RKA services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

65.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

66.     As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

67.     Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiffs express no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average*) given the applicable market.

68.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such RKA services.

<u>Investments</u>

69.     Plan fiduciaries of a defined contribution plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan participants.

70.     The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

71.     In selecting different investment options to make available to plan participants, plan fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options.

14

72.     When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark. Thus, the primary emphasis when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

73.     CapTrust, one of the largest providers of fiduciary services to retirement plan sponsors, specifically identifies on its website a fiduciary "pitfall" is "benchmarking only the total expense ratio" and failing to consider the net expense, i.e., "expense ratio minus revenue sharing" pointing out that, "what should be compared to other investment managers of that same asset class or category is expense ratio minus revenue sharing." *See* CapTrust Website, *Understanding and Evaluating Retirement Plan Fees/Part Two: Benchmarking Investment Fees*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-two-benchmarking-investment-fees/.

## THE PLAN

74.     During the entire Class Period, the Plan received RKA services from Fidelity.

75.     At all relevant times, the Plan's RKA fees were objectively unreasonable and excessive when compared with RKA fees of other comparable 401(k) plans offered by other sponsors that had a similar number of plan participants.

76.     The fees were also excessive relative to the level and quality of RKA services received since the same level and quality of services are generally offered to mega plans, like the WEC Energy Plan, regardless of the number or level of services selected by the Plan.

77.     It is clear based on the 5500 forms, 404(a)(5) participant disclosures, 408(b)(2) plan sponsor disclosures, and the administrative service agreement between Fidelity and WEC, that Fidelity did not provide any services at any higher level that were not also part of the standard package of RKA services provided by all recordkeepers to mega plans.

78. These excessive Plan RKA fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

79. During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiffs, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for RKA services.

80. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiffs and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

81. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the materially same level and quality of services currently being provided to the Plan.

82. Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of RKA fees is reasonable in light of the level and quality of RKA fees.

83. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide materially the same level and qualities of services for a more competitive reasonable fee if necessary.

84. A benchmarking survey, like from Fiduciary Decisions, is inadequate. Such surveys skew to higher "average prices," that favor inflated RKA fees. To receive a truly "reasonable" RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

16

85.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

86.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

87.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

88.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the record-keeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

89.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

### PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

90.     A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove record-keepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

91. During the Class Period, Defendants failed to regularly monitor the Plan's RKA fees paid to recordkeepers, including but not limited to Fidelity.

92. During the Class Period, Defendants failed to effectively solicit quotes and/or competitive bids from other recordkeepers in order to avoid paying unreasonable RKA fees by only engaging in an imprudent negotiation with Fidelity in 2016, an ineffective request for information (RFI) in 2018, and an inadequate benchmarking analysis by Fidelity itself and Fiduciary Decisions in 2021. None of these actions constituted effective solicitation of quotes or competitive bids.

93. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed imprudent processes that were done ineffectively given the objectively unreasonable RKA fees it paid to Fidelity, and in light of the level and quality of RKA services it received.

94. The information contained in the table below is taken directly from the 408(b)(2) Fee Disclosure documents provided to the Plan by Fidelity. The Total RKA Fees paid annually by the Plan during the Class Period are set forth in the table below.



95.



| | | $406,117 | $384,913 | $401,889 | $217,266 | $209,538 | $209,874 |
| | | $74 | $71 | $76 | $42 | $42 | $42 |

96. ████████████████████████████████████████

████████████████████████████████████

97. ████████████████████████████████████████████

████████████████████████████████████████████████

████

98.    The table below illustrates the annual Bundled RKA fees paid by other comparable plans of either similar sizes or with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundle RKA fees paid by the Plan (as identified in the table above).

| Plan | Participants | Assets | Bundled RK&A Fee Rate ($ /pp) | Recordkeeper |
|---|---|---|---|---|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $30 | Fidelity |
| **WEC Plan Average Fee** | **5,229** | **$1,797,947,682** | ■ | **Fidelity** |
| JBS 401(K) Savings Plan | 14,255 | $311,864,034 | $20 | Empower |
| Team Health 401(k) | 17,585 | $1,144,142,462 | $25 | Schwab |
| Beaumont Health 403(b) Plan | 36,916 | $2,098,360,517 | $28 | Fidelity |
| General Dynamics Corporation 401(K) Plan 6.0 | 45,018 | $8,193,372,264 | $25 | Fidelity |

99.    The Bundled RKA services received by the comparators were materially similar to the Bundled RKA services received by the WEC Energy Plan from Fidelity, and include such core services as daily valuations, processing payroll, participant enrollment, collecting beneficiary forms, and provide participant internet, phone, and statements.

100.    Additionally, the white trend line created by graphing these Bundled RKA fee rates provides evidence of what Fidelity and other recordkeepers are willing to accept to provide the Bundled RKA services across a range of participants when a recordkeeper, like Fidelity, is required to be competitive to win or retain the business.



101.    The table below lists the Total RKA Fees paid by several similarly sized plans during 2018, based on 5500 Forms from 2018, which is a year reflective generally of all years in the relevant Class Period.

**Comparable Plans' RKA Fees Based on Publicly Available Information from 2018 Form 5500**

| Plan | Participants | Assets | RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $99,814,049 | $49 | ADP |
| Hitachi Vantara Corporation Retirement And Savings Program | 3,890 | $680,441,899 | $45 | Fidelity |
| The Boston Consulting Group, Inc. Employees' Profit Sharing R | 4,369 | $421,208,989 | $43 | Vanguard |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $20 | T. Rowe Price |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $45 | Great-West |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $41 | T. Rowe Price |
| The Boston Consulting Group, Inc. Employees' Savings Plan An | 8,067 | $894,454,060 | $42 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $36 | Fidelity |
| Children's Medical Center Of Dallas Employee Savings Plan 40 | 9,356 | $349,335,673 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $31 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $28 | Great-West |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $33 | Great-West |
| Southern California Permanente Medical Group Tax Savings R | 10,770 | $773,795,904 | $31 | Vanguard |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $31 | Great-West |

102.    The graph below provides in blue the trend line generated by the Total RKA Fees paid by the similarly sized plans in the table above.



103.     The trend line that can be generated from those data points is, as noted above, a reliable predictor of reasonable Total RKA Fee Rate paid by a plan after it goes through a prudent and competitive process. It is also a reliable indicator of the initial Bundled RKA Fee Rate, for any given number of plan participants, around which a plan would expect to see bids when initial bids are solicited following prudent, competitive practices, which would include soliciting both open architecture bids as well as proprietary bids.

104.     The actual initial bids received by the Plan in this case are also consistent, but a bit on the high side as a result of the Plan Fiduciaries' failure to properly solicit both proprietary and open architecture bids and the more informal nature of the 2018 RFI.

105.     As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Total RKA services.

106.     When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL") and solicits bids from several recordkeepers in a competitive environment, some initial bids for the RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate an RKA fee lower than the trend line such that the Total RKA fee would be proximate to the trend line.

107.     From May 10, 2016, through December 31, 2021, and using the Vanguard Institutional Index (VIIIX) as a proxy for an investible S&P 500 index to apply appropriate

Case 2:22-cv-00555-JPS   Filed 03/15/23   Page 22 of 43   Document 45-1

earnings to the annual Losses caused by the Plan Fiduciaries' conduct, the Plan has suffered Losses of $2,171,839 as a result of excessive and unreasonable RKA fees.

108. The S&P 500 Index was used to calculate the investment returns the Plan could have achieved if the excess amounts paid for RKA services were returned to the Plan and invested in a conservatively timely manner. The S&P 500 Index is a widely recognized proxy for the United States stock market. It also is the most widely used benchmark and most recognized benchmark among investors.

109. The losses are summarized in the tables below.

| RK&A Fee Losses | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| RK&A Fee Annual Losses ($/pp)[2] | $37 | $51.14 | $55.10 | $38.79 | $25.35 | $21.51 |
| RK&A Fee Annual Losses ($)[2] | $204,506 | $277,647 | $292,970 | $200,671 | $126,469 | $107,467 |
| Compounding percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% |
| Cumulative Compounded RK&A Fee Losses | $204,506 | $526,777 | $796,516 | $1,247,930 | $1,604,143 | $2,171,839 |

110. This method for calculating the cumulative compounded Bundled RKA Fee losses is conservative because it assumes that excessive fees paid during one calendar year are not returned to the Plan until the last day of that year. Therefore, those losses do not start compounding until the following year.

111. The total value of the losses suffered by the Plan as a result of the Plan fiduciaries' failure to abide by the standard of care for prudent plan fiduciaries is $2,171,839 through December 31, 2021.

112. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed

here because recordkeepers for mega plans are providing the materially same level and quality of services.

113. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, Fidelity, and Defendants could have obtained the same RKA services for less from other, similar recordkeepers if only an effective and competitive solicitation process had been completed during the Class Period.

114. The higher cost RKA services selected by Defendants were materially similar to lower-cost RKA services available in the market as highlighted by the chart above.

115. Plaintiffs paid these excessive RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

116. Plaintiff Munt has participated in several 401(k) plans from several employers and there have been no material differences in the services that he has received between previous plans and this Plan.

117. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any effective examination and competitive comparison of the RKA fees it paid to Fidelity. Instead, Defendants compared apples to oranges in considering RKA bids from different recordkeeping by not considering the proprietary fund discount Fidelity received by having the vast majority of funds in the Plan in comparing bids during the 2018 RFI.

118. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in an effective examination and comparison of the Plan's RKA fees it

paid to Fidelity, but Defendants did so ineffectively given that it paid *almost twice* for RKA fees than it should have.

119. During the entirety of the Class Period, and had Defendants engaged in an effective examination comparison of the RKA fees it paid to Fidelity through a prudent process, it would have realized that the Plan was compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan participants, and should have removed Fidelity.

120. The Plan recordkeeping fees were also excessive relative to the RKA services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in RKA fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

121. The market for RKA services for mega plans, like the WEC Energy Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for RKA services and what the reasonable fair market fee was for materially similar services.

122. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING
## & MONITORING INVESTMENT OPTIONS

123.   For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

124.   That accepted process involves evaluating the performance history, tenure, and stability, of the current portfolio manager, the risk adjusted returns, and the fees.

125.   Although there is nothing inappropriate in having active investment options as a plan investment options, when an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

126.   From the perspective of a plan participant, the other critical component of the analysis is the fees.  The "total expense ratio" of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

127.   As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RKA services as well as the different fee components of the investment options selected to be made available to plan participants.

128.   Plan fiduciaries of plans as large as the Defendants' Plan are deemed to be "institutional investors" and have a higher level of knowledge of the different components

of fees within the total expense ratio of an investment option.

## DEFENDANTS' INVESTMENTS IN THE PLAN

129.    A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. (b)(1).

130.    While higher-cost mutual funds may outperform a less-expensive option over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, THE WASHINGTON POST, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index Funds Trounce Actively Managed Funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("[L]ong-term data suggests that actively managed funds 'lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.'")

131.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio.")

## THE PLAN'S INVESTMENT IN THE FIDELITY FREEDOM FUNDS

132.   The Plan offers a suite of thirteen (13) target date funds. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.

133.   All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's "glide path." The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

134.   According to the Plan's Form 5500s, from at least December 31, 2014 through the present, the Plan offered Fidelity Freedom target date funds. Fidelity Management & Research ("FMRC") is the second largest target date fund provider by total assets. The Fund's target date offerings consisted during part of the Class Period of the Fidelity Freedom Fund Class K6 (the "Active suite").

135.   Committee Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider.

136.   Committee Defendants failed to act prudently and breached their fiduciary duty by imprudently selecting and retaining the Active suite of the Fidelity Freedoms Funds and for the entire Class Period.

137.    Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction. In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts to locate underpriced securities.

138.    This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite. A March 2018 Reuters special report on the Fidelity Freedom funds details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."

139.    The flow of funds to, or from, target date families constitute one indicator of the preferences of investors at large. According to Morningstar's report on the 2019 Target Date Fund Landscape, *see* MORNINGSTAR, *2019 Target-Date Fund Landscape: Simplifying the Complex*, available at https://www.morningstar.com/lp/tdf-landscape, investor demand for low-cost target date options has skyrocketed in recent years.

140.    The ITPC's actions in offering and maintaining the Active suite in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite.

141.    The chart below identifies suitable alternative replacement funds for each asset class in the Plan that Committee Defendants could have selected in real-time at the beginning of the Class Period, instead of the Fidelity Freedom Active suite and a number of

other imprudently-selected and retained funds. Because Defendants failed to do so, as a prudent fiduciary would have done, the following damages accrued as of December 31, 2022:

| | Ticker * | 2022/12 |
|---|---|---|
| Columbia Small Cap Index Inst | NMSCX | $ 1,733,924.44 |
| T. Rowe Price Capital Appreciation | PRWCX | $ 4,482,899.11 |
| Morgan Stanley Inst Intl Advtg I | MFAIX | $27,949,413.11 |
| American Funds Retire Inc Port-Mod | RRRPX | $ 115,644.00 |
| American Funds 2010 Trgt Date Retire | RFTTX | $ 212,370.09 |
| American Funds 2015 Trgt Date Retire | RFJTX | $ (282,232.35) |
| American Funds 2020 Trgt Date Retire | RRCTX | $ (723,838.85) |
| American Funds 2025 Trgt Date Retire | RFDTX | $ 1,707,500.72 |
| American Funds 2030 Trgt Date Retire | RFETX | $ 806,209.77 |
| American Funds 2035 Trgt Date Retire | RFFTX | $ 888,463.89 |
| American Funds 2040 Trgt Date Retire | RFGTX | $ 480,757.53 |
| American Funds 2045 Trgt Date Retire | RFHTX | $ 477,762.89 |
| American Funds 2050 Trgt Date Retire | RFITX | $ 400,701.30 |
| American Funds 2055 Trgt Date Retire | RFKTX | $ 57,413.27 |
| American Funds 2060 Trgt Date Retire | RFUTX | $ (39,812.44) |
| American Funds 2065 Trgt Date Retire | RFVTX | $ (8,367.72) |
| American Funds Retire Inc Port-Mod | RRRPX | $ 1,001,765.42 |
| Victory Sycamore Established Value R | GETGX | $11,168,351.53 |
| Columbia Small Cap Index Inst | NMSCX | $ 8,529,089.97 |
| Invesco International Small-Mid Com A | OSMAX | $ 1,692,814.55 |
| JPMorgan Equity Income I | HLIEX | $13,403,428.29 |

**$ 74,054,258.54**

142. During the Class Period and because Committee Defendants failed to act prudently by engaging in an objectively reasonable investigation process when selecting its investments, Plaintiffs and the Plan's participants incurred unnecessary and substantial expenses and costs in the tens of millions of dollars.

143. During the Class Period and had Committee Defendants acted prudently by engaging in an objectively reasonable investigation process when selecting its investments,

Committee Defendants would have prudently chosen lower-cost and/or better-performing investment alternatives.

144. During the Class Period and because Committee Defendants failed prudently to engage in an objectively reasonable investigation process when selecting its target date and other investments, Committee Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Class, which breached their fiduciary duty of prudence under ERISA.

## CLASS ACTION ALLEGATIONS

145. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

146. In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the WEC Energy Group Employee Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 10, 2016 and running through the date of judgment.

147. The Class includes approximately 5,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

148. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

31

a.     Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.     Whether Defendants breached their fiduciary duties to the Plan;

c.     What are the losses to the Plan resulting from each breach of fiduciary duty;

d.     Whether Defendants engaged in a fiduciary prohibited transaction when it engaged in self-dealing; and

e.     What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty and engaging in prohibited transactions.

149.   Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

150.   Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they are Participants in the Plan during the Class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

151.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dis-

positive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

152.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

153.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

154.    The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and do not involve mismanagement of individual accounts.

155.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

156.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

157.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

### FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiffs, on behalf of themselves and Class, Against
### Defendants WEC Energy and ITPC - RKA Fees)

158.    Plaintiffs restate the above allegations as if fully set forth herein.

159.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

160.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

161.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

162.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

163.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's

RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

164. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

165. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

166. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

167. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

168. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

169.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the WEC Energy Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
**Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against
Defendants WEC Energy and ITPC - Investment Management Fees)**

170.    Plaintiffs restate the above allegations as if fully set forth herein.

171.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

172.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in managing the investments, including target date funds and other funds of the Plan.

173.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, that those perform reasonably, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

174.    During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently for Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

175.   During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiffs, by failing to manage the assets of the Plan prudently for Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

176.   Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

177.   During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiffs, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

178.   Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion, prudently evaluating and monitoring the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

179.   Defendants failed to employ a prudent process by failing to evaluate the cost and performance of the Plan's investments and fees critically or objectively in comparison to other more reasonable investment options. Defendants selected and retained for years as Plan investment options mutual funds and target date funds with high expenses and poor

performance relative to other investment options that were readily available to the Plan at the start of the Class Period.

180.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

181.    As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

182.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Committee Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendant WEC Energy - RKA Fees)**

183.    Plaintiffs restate the above allegations as if fully set forth herein.

184.    Defendant WEC Energy, through its CEO, had the authority to appoint and remove members or individuals responsible for Plan RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

185. In light of this authority, Defendant WEC Energy had a duty to monitor those individuals responsible for Plan RKA fees on the ITPC to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

186. Defendant WEC Energy had a duty to ensure that the individuals responsible for Plan administration on the ITPC possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's recordkeeper; and reported regularly to Defendant.

187. The objectively unreasonable and excessive RKA fees paid by the Plan inferentially suggest that Defendant WEC Energy breached its duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the ITPC or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA fees;

    b. Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c. Failing to remove individuals responsible for Plan RKA fees on the ITPC whose performance was inadequate in that these individuals continued to pay the same RKA fees even though solicitation of competitive bids would have shown that maintaining Fidelity as recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

188.    As the consequences of the breaches of the duty to monitor for recordkeeping fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

189.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant WEC Energy is liable to restore to the WEC Energy Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiffs, on behalf of themselves and Class, Against
Defendant WEC Energy - Investment Management Fees)

190.    Plaintiffs restate the above allegations as if fully set forth herein.

191.    Defendant WEC Energy, through their CEO, had the authority to appoint and remove members or individuals responsible for Plan investment management fees on the ITPC and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

192.    In light of this authority, Defendant WEC Energy had a duty to monitor those individuals responsible for Plan investment management fees on the ITPC to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

193.    Defendant WEC Energy had a duty to ensure that the individuals responsible for Plan administration on the ITPC possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties);

had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

194.    The objectively unreasonable and excessive investment management fees paid by the Plan inferentially suggest that Defendant WEC Energy breached its duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees on the ITPC or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

    b.    Failing to monitor the process by which the ITPC investigated the availability of more reasonably-priced investment management fees; and

    c.    Failing to remove individuals responsible for Plan investment management fees on the ITPC whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining those target date funds, and other funds was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

195.    As the consequences of the foregoing breaches of the duty to monitor for investment management fees the Plaintiffs and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

196.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant WEC Energy is liable to restore to the WEC Energy Plan all loses caused by its failure to adequately monitor individuals responsible for Plan investment management fees on the ITPC. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA and investment management costs, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order requiring WEC Energy to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against WEC Energy as necessary to effectuate relief, and to prevent WEC Energy's unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 15th day of March, 2023

s/Paul M. Secunda _____ ____
James A. Walcheske
Scott S. Luzi
Paul M. Secunda
David M. Potteiger
Kirsten H. Hendra
WALCHESKE & LUZI, LLC
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com
E-Mail: dpotteiger@walcheskeluzi.com
E-Mail: khendra@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*