# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JONATHAN MUNT, GLORIA J.
HARMON, and SANDRA M.
WINGERS,

                Plaintiffs,

v.

WEC ENERGY GROUP, INC. and
WISCONSIN ENERGY INVESTMENT
TRUST POLICY COMMITTEE,

                Defendants.

Case No. 22-CV-555-JPS

**ORDER**

## 1.      INTRODUCTION

Plaintiffs Jonathan Munt ("Munt"), Gloria J. Harmon ("Harmon"), and Sandra M. Wingers ("Wingers") (together, "Plaintiffs") sue Defendants WEC Energy Group, Inc. ("WEC") and its Investment Trust Policy Committee (the "ITPC") (together, "Defendants") for violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. ECF No. 45-1 at 2.[1]

---

[1] The Third Amended Complaint ("TAC") is the operative pleading in this matter. Text order dated Mar. 17, 2023; ECF Nos. 44-1 and 45-1. Pursuant to the parties' protective order as well as Plaintiffs' motion to restrict, which the Court granted, the full TAC, ECF No. 44-1, is restricted and therefore viewable only to the parties in this case. ECF Nos. 16 and 44; text order dated Mar. 17, 2023. The TAC is publicly accessible in redacted form at ECF No. 45-1; this is the version of the TAC to which the Court will cite, the pagination of which does not differ from the restricted version.

Again pursuant to the protective order, ECF No. 16, the parties have submitted other documents supporting the motions addressed in this Order in both restricted and redacted forms, accompanied by motions to restrict. ECF Nos.

WEC is "one of the nation's largest electric generation and distribution and natural gas delivery holding companies[,] . . . provid[ing] energy services to more than 4.6 million customers in Wisconsin" and surrounding states. ECF No. 45-1 at 6–7. Plaintiffs are current and former employees of WEC who participate in the WEC Employee Retirement Savings Plan (the "Plan"), a 401(k) defined contribution pension plan. *Id.* at 5–6. Defendants are fiduciaries of the Plan. *Id.* at 3.[2]

ERISA imposes a duty of prudence on those acting in a fiduciary capacity for employers who offer retirement plans under the statute. It requires plan fiduciaries to "discharge [their] duties with respect to [the] plan . . . with the care, skill, prudence, and diligence under the

---

49, 56, 64. Each motion to restrict will be granted in keeping with the protective order in this matter and because they are unopposed. The filings that are the subject of those motions will be maintained as restricted entries, visible only to the parties in this case and the Court, with their redacted counterparts remaining publicly available.

The Court has relied on restricted documents and redacted information in preparing this Order, but to facilitate eventual public access to the documents underlying this decision, the Court cites as much as possible to the publicly available, redacted docket entries. (As with the two versions of the TAC, it appears that pagination does not differ between the restricted and redacted versions of these documents.) Accordingly, since this Order may contain information that is subject to the protective order, the Court will issue it in restricted form. The parties must confer and, on or before **April 12, 2024**, file a joint notice stating what redactions will apply to this Order, which the Court will then adopt into a redacted, public-facing version.

[2]Prior versions of the complaint named individual members of the WEC Board of Directors and the Board of Directors itself as defendants, but the TAC names only these two institutional Defendants. ECF No. 45-1. Defendants challenged a prior version of the complaint for failure to adequately allege that the then-named defendants, individual board members and the Board of Directors itself, were fiduciaries within the meaning of ERISA. ECF No. 25 at 12–16. However, as noted *infra* in the beginning of Section 4, the parties agree that WEC and the ITPC are Plan fiduciaries.

circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a). Plaintiffs allege that Defendants violated their duty of prudence in two ways. ECF No. 45-1 at 3.

First, Plaintiffs allege that Defendants "requir[ed] the Plan to 'pay[] excessive recordkeeping [and administrative ("RKA")] fees,' . . . and [failed] to remove their high-cost recordkeeper, Fidelity Investments Institutional ('Fidelity')." *Id.* (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 172 (2022) (hereinafter "*Hughes I*"). Second, Plaintiffs allege that Defendants "'offer[ed] [and retained] needlessly expensive investment options,' in the form of target-date funds (Fidelity Freedom Fund Active Suite) and other funds"; in other words, Defendants "offer[ed] higher-cost investments to the Plan's participant[s] when it could have offered the same investment opportunities less expensively." *Id.* (quoting *Hughes I*, 595 U.S. at 172). Plaintiffs also bring two claims against WEC for failing to monitor the ITPC in selecting, monitoring, and making decisions about recordkeeper and investment options for the Plan. *Id.* at 38–41. Plaintiffs purport to bring each of these claims on behalf of a class WEC employees who participated in the Plan from May 10, 2016 onward. *Id.* at 1, 3.

Defendants now move both under Federal Rule of Civil Procedure 12(b) to dismiss the TAC for failure to state a claim and/or for lack of standing, and under Federal Rule of Civil Procedure 56 for summary judgment on each of Plaintiffs' claims.[3] ECF No. 50. The motions are fully

_____

[3] The Court did not have occasion to rule on Defendants' earlier-filed motion to dismiss, ECF No. 24, before the parties indicated in a settlement report, ECF No. 40, that Plaintiffs were dropping many of their claims. ECF No. 41.

briefed, ECF Nos. 54, 57, 65, and both parties have submitted supplemental authority in support of their positions. ECF Nos. 69, 75, and 79 (Plaintiffs' notices); ECF No. 76 (Defendants' notice). Additionally, Plaintiffs move to strike Defendants' response to their statement of disputed facts as inconsistent with the Court's Pretrial Procedure Order, ECF No. 6, and/or with the Local Rules governing summary judgment practice; that motion is also fully briefed. ECF Nos, 68, 70, 71.

Also fully briefed and before the Court is Plaintiffs' motion to certify a class around Plaintiffs' claim that they were subject to "excessive investment fees and poor investment performance" and that WEC did not adequately monitor the ITPC to address or prevent these decisions. ECF No. 59-1 at 8 (Plaintiffs' brief); ECF Nos. 72, 74. The parties have stipulated to certification of a class around Plaintiffs' claim of excessive recordkeeping fees. ECF No. 55.

As more fully explained in the balance of this Order, the Court finds that this case is much ado about nothing of substance. For the reasons stated below, Defendants' motion to dismiss, ECF No. 50, will be granted in full; to the extent it sought summary judgment, the motion will be denied as moot. Plaintiffs' motions for class certification, ECF No. 59, and to strike, ECF No. 68, will be denied as moot. This case will be dismissed with prejudice in its entirety.

---

Defendants opposed the filing of the TAC; in accepting the TAC, the Court stated that Defendants could "attack the sufficiency of the allegations and/or the evidence in support thereof via dispositive motion." Text order dated Mar. 17, 2023.

## 2. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is one with "enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's allegations. *Twombly*, 550 U.S. at 556. In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). But the Court "need not accept as true 'legal conclusion[s, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

"In putative ERISA class actions, Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL

4372363 (7th Cir. Sept. 21, 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). "Courts apply a 'careful, context-sensitive scrutiny of a complaint's allegations' to 'divide the plausible sheep from the meritless goats.'" *Id.* (quoting *Dudenhoeffer*, 573 U.S. at 425). Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, . . . courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes I*, 595 U.S. at 177. In keeping with this instruction from the Supreme Court together with the federal plausibility pleading standard pronounced in *Twombly* and *Iqbal*, a court reviewing a complaint alleging breach of fiduciary duty should consider "alternative explanations for an ERISA fiduciary's conduct, *Hughes* [*I*, 595 U.S. at 177], but [those alternative explanations] need not be overcome conclusively by the plaintiff." *Hughes v. Nw. Univ.*, 63 F. 4th 615, 630 (7th Cir. 2023) (hereinafter "*Hughes II*"). "Accordingly, whether a claim survives dismissal necessarily depends on the strength or obviousness of the alternative explanation that the defendant provides." *Id.* at 629.

3.    **FACTUAL ALLEGATIONS IN THE TAC**

The Plan had between $1.5 billion and more than $2 billion in assets in the years 2014 to 2020. ECF No. 45-1 at 8. The number of WEC employees participating in the Plan ranged from 5,433 in 2014 to 4,777 in 2020, with the number of participants decreasing every year. *Id.* The Plan is one of the largest defined contribution plans in the nation. *See id.* It is considered a "mega 401(k) plan" based on the amount of assets under its management. *Id.* at 6 (citing *Ctr. for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022)).

### 3.1 Recordkeeping

#### 3.1.1 Background

Fiduciaries of mega 401(k) plans and other defined contribution plans hire service providers to deliver retirement plan benefits to their employees. *Id.* at 9. There is a group of national retirement plan services providers commonly referred to as "recordkeepers" that have developed bundled service offerings that can meet all the needs of mega retirement plans. *Id.* Fidelity is one such recordkeeper. *Id.* These recordkeepers deliver all the essential RKA services to retirement plans through standard, bundled offerings of materially the same level and quality. *Id.*

Mega plans, such as the Plan at issue here, receive certain RKA services on a "bundled" fee basis, whereby the plan pays for services to be provided to participants on a buffet-style or "all you can eat" basis. *Id.* at 9–10. Services included in a bundled RKA fee typically include, for example, recordkeeping, processing asset purchases and sales, participant communications, plan consulting services including assistance in selecting the investments offered to participants, and accounting and audit services including preparation of annual reports such as the Form 5500. *Id.* at 10. Based on the Plan's 408(b)(2) sponsor disclosures and the relevant sections of the administrative service agreement between WEC and Fidelity (the "Recordkeeping Agreement"), the Plan received all these services as part of the bundled fee it paid to Fidelity (the "Bundled RKA Fee"). *Id.* at 11.

Similarly, recordkeepers charge mega plans additional fees "a la carte" for other RKA services based on the usage of those services by individual participants. *Id.* Services provided on such a basis typically include loan processing, brokerage services and account maintenance, distribution services, and processing of Qualified Domestic Relations

Orders ("QDROs"). *Id.* Finally, recordkeepers charge mega plans other fees on an "ad hoc" basis, such as terminated maintenance fees. *Id.* Plaintiffs state that, based on the Plan's 408(b)(2) sponsor disclosures and the Recordkeeping Agreement, the Plan received all of those services typically provided as "a la carte" and "ad hoc" services.[4] Together, bundled, a la carte, and ad hoc service fees make up a plan's total recordkeeping fee (here, the Plan's "Total RKA fee").

Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the RKA fee rates proposed by recordkeepers. *Id.* at 12.

For mega plans, any minor variations in the level and quality of RKA services described above has little to no material impact on the fees charged by recordkeepers. *Id.* at 11. Because recordkeepers offer materially similar bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants, and the fees that recordkeepers have been willing to accept for providing these services have significantly decreased. *Id.* at 13. The underlying cost to a recordkeeper of providing RKA services to a retirement plan is primarily dependent on the number of participant accounts in the plan rather than the amount of assets in it. *Id.*

### 3.1.2 Defendants' Alleged Imprudence

The basic theory of Plaintiffs' recordkeeping claim is that, due to Defendants' conduct, the Plan overpaid Fidelity for RKA services, leading

---

[4]However, as explained later, Defendants argue that the Plan's 408(b)(2) disclosure shows that QDRO processing was included in the Plan's bundled fee rather than having been paid for on an a la carte basis.

to lower net returns on Plan participants' retirement benefits. Plaintiffs allege that this overpayment occurred because Defendants failed to regularly monitor the RKA fees the Plan paid and failed to effectively solicit quotes and/or competitive bids from other recordkeepers who might have been able to deliver RKA services at a lower cost. *Id.* at 18; *see also id.* at 23–25 (summarizing losses and alleged imprudence). Plaintiffs allege that Defendants engaged only in an "imprudent" negotiation with Fidelity in 2016, an "ineffective" request for information in 2018, and an "inadequate" benchmarking analysis by Fidelity itself and another entity in 2021. *Id.* at 18.[5]

Plaintiffs state that, based on the Plan's 408(b)(2) disclosures, the Plan paid Fidelity a Total RKA fee that averages out to ▮ per participant:



*Id.* Similarly, Plaintiffs state that the Plan paid Fidelity a Bundled RKA Fee averaging out to ▮ per participant:

---

[5]In other, similar cases, plaintiffs have not been able to make such allegations at the pleadings phase. *See, e.g.*, *Laabs v. Faith Techs.*, No. 20-CV-1534-WCG-SCD, 2023 WL 9321358, at *3 (E.D. Wis. Aug. 30, 2023), *report and recommendation adopted*, No. 20-C-1534, 2024 WL 218418 (E.D. Wis. Jan. 19, 2024) ("Because she doesn't know what process Faith Technologies used to select, retain, or determine the fees paid to Prudential, Laabs does not allege any direct instances of misconduct or mismanagement. Instead, Laabs says we should infer an imprudent decision-making process from circumstantial evidence . . . ."). This case is somewhat unusual in that Plaintiffs drafted the TAC with the benefit of completed fact discovery.

*Id.* at 19.

Plaintiffs allege that the RKA fees that the Plan paid to Fidelity were objectively unreasonable and excessive by two metrics. First, the fees were allegedly excessive when compared with the per-participant RKA fees paid by comparable 401(k) plans with similar numbers of plan participants offered by other sponsors. *Id.* at 15. Second, the fees were allegedly excessive relative to the level and quality of RKA services received in exchange for the fee paid. *Id.* Since recordkeepers provide, and mega plans generally receive, the same level and quality of services, Plaintiffs' theory goes, a reasonable RKA fee would have been one more aligned with those that mega (or otherwise similarly sized) plans paid. *See id.*

Plaintiffs offer a comparison chart to demonstrate the alleged excessiveness of the Bundled RKA Fee that the Plan paid to Fidelity as compared to those paid by other plans:

Comparable Plans' Bundled RKA Fee Rates

| Plan | Participants | Assets | Bundled RK&A Fee Rate ($/pp) | Recordkeeper |
|------|-------------|--------|------------------------------|--------------|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $30 | Fidelity |
| **WEC Plan Average Fee** | **5,229** | **$1,797,947,682** | ███ | **Fidelity** |
| JBS 401(K) Savings Plan | 14,255 | $311,864,034 | $20 | Empower |
| Team Health 401(k) | 17,585 | $1,144,142,462 | $25 | Schwab |
| Beaumont Health 403(b) Plan | 36,916 | $2,098,360,517 | $28 | Fidelity |
| General Dynamics Corporation 401(K) Plan 6.0 | 45,018 | $8,193,372,264 | $25 | Fidelity |

*Id.* at 20. Similarly, they offer a chart purporting to show the excessiveness of the Total RKA Fee that the Plan paid:

| Plan | Participants | Assets | RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Associated Materials, LLC 401(K) Retirement Plan | 3,639 | $99,814,049 | $49 | ADP |
| Hitachi Vantara Corporation Retirement And Savings Program | 3,890 | $680,441,899 | $45 | Fidelity |
| The Boston Consulting Group, Inc. Employees' Profit Sharing R | 4,369 | $421,208,989 | $43 | Vanguard |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $20 | T. Rowe Price |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $45 | Great-West |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $41 | T. Rowe Price |
| The Boston Consulting Group, Inc. Employees' Savings Plan An | 8,067 | $894,454,060 | $42 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $36 | Fidelity |
| Children's Medical Center Of Dallas Employee Savings Plan 40 | 9,356 | $349,335,673 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $31 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $28 | Great-West |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $33 | Great-West |
| Southern California Permanente Medical Group Tax Savings R | 10,770 | $773,795,904 | $31 | Vanguard |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $31 | Great-West |

*Id.* at 21. Plaintiffs state that, based on these data, a reasonable Bundle RKA Fee for the Plan to pay would have been $26–27 per participant, and a reasonable Total RKA Fee would have been $33–38 per participant. *Id.* at 20–21 (charts with trend lines "provid[ing] evidence of what Fidelity and other recordkeepers are willing to accept to provide" RKA services).[6] Plaintiffs aver that the comparator plans' RKA fee rates are "a reliable predictor" of a reasonable RKA fee "paid by a plan after it goes through a prudent and competitive process." *Id.* at 22.

### 3.2 Investment Claim

#### 3.2.1 Background

When choosing different investment options to make available to plan participants, plan fiduciaries can choose from actively managed options and/or index (that is, passively managed) options. *Id.* at 14, 27. When an actively managed investment option is chosen, plan fiduciaries generally look to the skill of the portfolio manager, which differentially impacts the performance of the investment. *Id.* at 26. Plans pay fees to the

---

[6]The lower numbers in each of these ranges are designated for "WEC Master Trust Aggregated Participants." ECF No. 45-1 at 20–21. The TAC does not explain what this means.

manager of an actively managed investment; the amount of these fees—like RKA fees—impact the benefit amounts ultimately paid out to plan participants. *See id.* Plaintiffs posit—citing two news articles and two scholarly journal articles—that actively managed funds and/or those with high management fees tend to perform worse than "less-expensive option[s]." *Id.* at 27.

### 3.2.2   Defendants' Alleged Imprudence

The Plan offers its participants a suite of thirteen target date funds ("TDFs"). *Id.* at 28. TDFs are actively managed funds. *Id.* TDFs incorporate a portfolio of underlying funds, which are gradually shifted to become more conservative as the assumed target retirement year approaches. *Id.* TDF managers make changes to the funds' allocations to stocks, bonds, and cash over time; these allocation shifts are referred to as a fund's "glide path." *Id.* The underlying funds that TDF managers choose to represent each asset class can be actively or passively managed. *Id.*

According to the Plan's Form 5500s, from at least December 31, 2014 to the present, the Plan offered Fidelity Freedom TDFs. *Id.* The target date offerings consisted of the Fidelity Freedom Fund Class K6 (the "Fidelity Freedom Fund Active Suite" or the "Active Suite").[7] *Id.* Plaintiffs allege that Defendants were imprudent for selecting and retaining the Active Suite. *Id.*

The problem with the Active Suite, in Plaintiffs' estimation, is that it enabled its portfolio managers to engage in strategies that "heap[ed] . . . unnecessary risk on investors," including Plan participants who elected the

---

[7]Plaintiffs allege in this paragraph that the Fidelity Freedom Fund Active Suite was offered "during *part of* the [c]lass [p]eriod" (that is, from May 10, 2016 to the present), and two paragraphs later state that Defendants "select[ed] and retain[ed] the Active [S]uite . . . for the *entire* [c]lass [p]eriod." ECF No. 45-1 at 28 (emphases added). It is not clear which is the correct timeframe.

Active Suite, and led them to "los[e] confidence." *Id.* at 29 ("Since the Active [S]uite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction. In a departure from the accepted wisdom that [TDFs] should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts to locate underpriced securities. . . . A March 2018 Reuters special report on the Fidelity Freedom funds details how many investors lost confidence in the Active [S]uite 'because of their history of underperformance, frequent strategy changes and rising risk.'").

According to Plaintiffs, the ITPC's continuing to offer the Active Suite "evidences their failure to acknowledge, or act upon, investors' crumbling confidence" in it. *Id.* They imply that Defendants should have known of Plan participants' investment preferences based on a 2019 article that found that "investor demand for low-cost target date options ha[d] skyrocketed in recent years." *Id.* (citation omitted). They state that Defendants were imprudent overall because they "failed prudently to engage in an objectively reasonable investigation process when selecting [the Plan's] target date and other investments." *Id.* at 31.

As for what Defendants should have done instead of offering the Active Suite,[8] Plaintiffs state that Defendants "could have chosen any of the target date families offered by Fidelity, or those of any other target date provider." *Id.* at 28. They provide a chart identifying "suitable alternative

_____

[8]Plaintiffs say the Plan offered participants "a number of other imprudently-selected and retained funds" besides the Active Suite, but do not name them. *Id.* at 29–30.

replacement funds for each asset class in the Plan that [the ITPC] could have selected in real-time at the beginning of the [c]lass [p]eriod":

| | Ticker * | 2022/12 |
|---|---|---|
| Columbia Small Cap Index Inst | NMSCX | $ 1,733,924.44 |
| T. Rowe Price Capital Appreciation | PRWCX | $ 4,482,899.11 |
| Morgan Stanley Inst Intl Advtg I | MFAIX | $27,949,413.11 |
| American Funds Retire Inc Port-Mod | RRRPX | $ 115,644.00 |
| American Funds 2010 Trgt Date Retire | RFTTX | $ 212,370.09 |
| American Funds 2015 Trgt Date Retire | RFJTX | $ (282,232.35) |
| American Funds 2020 Trgt Date Retire | RRCTX | $ (723,838.85) |
| American Funds 2025 Trgt Date Retire | RFDTX | $ 1,707,500.72 |
| American Funds 2030 Trgt Date Retire | RFETX | $ 806,209.77 |
| American Funds 2035 Trgt Date Retire | RFFTX | $ 888,463.89 |
| American Funds 2040 Trgt Date Retire | RFGTX | $ 480,757.53 |
| American Funds 2045 Trgt Date Retire | RFHTX | $ 477,762.89 |
| American Funds 2050 Trgt Date Retire | RFITX | $ 400,701.30 |
| American Funds 2055 Trgt Date Retire | RFKTX | $ 57,413.27 |
| American Funds 2060 Trgt Date Retire | RFUTX | $ (39,812.44) |
| American Funds 2065 Trgt Date Retire | RFVTX | $ (8,367.72) |
| American Funds Retire Inc Port-Mod | RRRPX | $ 1,001,765.42 |
| Victory Sycamore Established Value R | GETGX | $11,168,351.53 |
| Columbia Small Cap Index Inst | NMSCX | $ 8,529,089.97 |
| Invesco International Small-Mid Com A | OSMAX | $ 1,692,814.55 |
| JPMorgan Equity Income I | HLIEX | $13,403,428.29 |

**$74,054,258.54**

*Id.* at 29–30. They provide no explanation about why these alternatives would have been "suitable" for Plan participants. They calculate damages in excess of $74 million "as of December 31, 2022" based on this chart, though they do not say what the number in the rightmost column actually represents. *Id.* at 30.

Although Plaintiffs offer general allegations about the investment management fees that plans might pay, *see supra* Section 3.2.1, and although they characterize their investment-based duty of prudence claim as challenging "investment management fees," *id.* at 36, the Court discerns no allegations in the TAC about the investment management fees that the Plan

paid to Fidelity and why those might have been unreasonable. Rather, this claim is premised on the theory that the Fidelity Freedom Fund Active Suite underperformed.

### 4.    ANALYSIS

To state a breach of fiduciary duty claim under ERISA, "a plaintiff must plead '(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff.'" *Albert*, 47 F.4th at 579 (quoting *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)). The fiduciary "duty of prudence requires a plan fiduciary to 'incur only costs that are reasonable in amount and appropriate to [its] investment responsibilities . . . .'" *Hughes II*, 63 F.4th at 627 (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) and citing *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019) and *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020)); *see also Tibble v. Edison Int'l*, 575 U.S. 523, 535 (2015) ("Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan."). Additionally, "the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment." *Hughes II,* 63 F.4th at 626 (citing *Tibble*, 575 U.S. at 529).

The only element of the breach of fiduciary duty claims at issue in the motion to dismiss is whether the TAC plausibly alleges that Defendants breached their fiduciary duty to Plan participants in either of the aforementioned two ways. *See* ECF No. 54 at 20–23, 29–30; *see also* ECF No. 52-1 at 3 (parties' joint statement of facts stipulating that "[t]he Plan

identifies WEC as the Plan Administrator and named fiduciary" and "WEC delegated [various] fiduciary responsibilities to the ITPC").

As detailed below, the Court finds that the TAC fails to state a claim for either the recordkeeping or the investments claim. Without underlying ERISA violations, the failure to monitor claims also fail.

### 4.1    Recordkeeping Claim

Plaintiffs allege that Defendants breached their fiduciary duty of prudence by authorizing the Plan to pay unreasonably high RKA fees to Fidelity and by failing to timely remove Fidelity as its recordkeeper. *See generally* ECF No. 45-1. Plaintiffs further allege a breach of duty claim premised on WEC's failure to monitor the ITPC in making these decisions. *Id.*

Defendants argue that Plaintiffs' recordkeeping claim should be dismissed because it "relies only on conclusory allegations about Defendants' processes and a comparison of alleged Plan fees for services relative to alleged fees paid by cherry-picked 'comparable' plans—comparisons that are contradicted by documents incorporated by reference into the TAC." ECF No. 54 at 8. They also argue that the derivative failure-to-monitor claim should be dismissed because, even if the TAC alleges an underlying duty of imprudence claim, "Plaintiffs offer no factual allegations as to the CEO's process for monitoring the ITPC." *Id.* at 36–37. The Court addresses each prong of this argument in turn.

As to the first point, Defendants argue that the TAC is too conclusory to state a plausible claim for relief because it "declare[s]" that Defendants engaged in an "imprudent" process for selecting and retaining the Plan's recordkeeper without "identify[ing] *how* or *why*" that process was imprudent or "stating the underlying facts on which the inference is based."

*Id.* at 21; *see also* ECF No. 65 at 7 (arguing that the TAC is silent with respect to "actions that . . . a prudent fiduciary might wish to take to control fee expenses" and "affirmatively demonstrates that Defendants did, in fact . . . adjust[] fee arrangements). Plaintiffs respond that the "complaint need not provide detail of the actual process" and that allegations "indirectly showing unlawful behavior" are enough. ECF No. 57 at 18 (quoting *Allen*, 835 F.3d at 678).

Defendants' argument is unpersuasive. The TAC alleges that Defendants "failed to effectively solicit quotes and/or competitive bids from other recordkeepers in order to avoid paying unreasonable RKA fees by only engaging in an imprudent negotiation with Fidelity in 2016, an ineffective request for information . . . in 2018, and an inadequate benchmarking analysis by Fidelity itself and Fiduciary Decision in 2021." ECF No. 45-1 at 18. Considering that the TAC later admits that the Plan decreased its RKA fees over time, *id.* (showing decrease in RKA fees from ▉ per participant in 2016 to ▉ 2021), whether Plaintiffs have in fact demonstrated imprudence overall is somewhat doubtful (and, indeed, the imprudence claim overall fails because, as the Court later concludes, the TAC fails to provide a sound basis for comparing the Plan's RKA fees with those that other plans paid). But these allegations, on their own, support a plausible inference that Defendants had an imprudent process for selecting and retaining a recordkeeper for the Plan. *See Hughes II*, 63 F.4th at 629–30 ("Where alternative inferences are in equipoise—that is where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss.") (citing *Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022)); *see also Glick v. ThedaCare, Inc.*, No. 20-CV-1236-WCG-SCD, 2023 WL 9327209, at *5 (E.D. Wis. July 20, 2023), *report and recommendation adopted*,

No. 20-C-1236, 2024 WL 233370 (E.D. Wis. Jan. 22, 2024) ("Glick. . . . does not assert that the plan's fees were unreasonable merely because there exist[ed] other, cheaper alternatives. Rather, the second amended complaint alleges that the plan didn't regularly solicit quotes or competitive bids, the plan failed to leverage its bargaining power to negotiate a lower fee, and other similarly sized plans received the same level of service for significantly less. Together those allegations support an inference that ThedaCare engaged in an unreasonable—and therefore imprudent—decision-making process (or lack of process) when it came to selecting, retaining, and paying [its recordkeeper] . . . .").

The Court agrees with Plaintiffs that adopting Defendants' argument would inappropriately "hold the TAC to a higher standard because discovery has been completed." ECF No. 57 at 18. Again, the question of the sufficiency of the TAC is before the Court in a somewhat irregular posture because it was drafted with the benefit of full fact discovery. *See supra* note 5. But—completed discovery or not—Plaintiffs *have* made more than merely conclusory allegations about the process Defendants used. Moreover, it would be inappropriate for the Court to require Plaintiffs to plead facts about the process Defendants used to select and retain a recordkeeper to which a litigant would not typically have access at the pleading phase.

Defendants next argue that these same allegations about Defendants' process, ECF No. 45-1 at 18, do not state a claim for ERISA breach of fiduciary duty because the Seventh Circuit does not require "a plan fiduciary [to] engage in competitive bidding." ECF No. 54 at 20–21 (citing *Hughes II*, 63 F.4th at 625–26). Plaintiffs respond by pointing out that the *Hughes II* court went on to state that "a fiduciary need not *constantly*

solicit quotes . . . to comply with its duty of prudence" and that "fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees[,] such as by . . . soliciting bids . . . may violate their duty of prudence." ECF No. 57 at 18 (quoting 63 F.4th at 625–26 and adding emphasis). They stress that "constant solicitation is [not] required" and that they have adequately alleged imprudence because they alleged that Defendants "failed to engage in any effective solicitations whatsoever." *Id.* at 19.

Again, the Court agrees with Plaintiffs. Defendants overstate this portion of *Hughes II*. The Seventh Circuit indeed read prior cases as "reject[ing] the notion that a failure to *regularly* solicit quotes or competitive bids from service providers breaches the duty of prudence." 63 F.4th at 625 (emphasis added) (quoting *Albert*, 47 F.4th at 579). But later in the same paragraph, the Seventh Circuit emphasized that plan fiduciaries "*may* violate their duty of prudence" by failing to take certain actions, including "soliciting bids." *Id.* at 625–26 (emphasis added). The Court does not read this portion of *Hughes II* as exempting a plan fiduciary from *ever* having to solicit competitive bids from other recordkeeping service providers, which is what Defendants appear to argue. At most, it stands for the proposition that ERISA fiduciaries are not liable for failing to solicit quotes or competitive bids at regular or prescribed intervals, though they might be liable for failing entirely to do so, or for failing to do so for a long period of time; at the very least, its permissive language ("may violate") reinforces that the breach-of-duty analysis is a context- and circumstances-driven one. *See Dudenhoeffer*, 573 U.S. at 425. Accordingly, the Court rejects this argument for dismissal.

Moving to the argument that the TAC relies on faulty comparators, Defendants advance two points. First, they argue that the TAC "artificially inflate[s] the amount of the Plan's [T]otal [RKA] fee" in at least two ways—demonstrated by the Plan's Recordkeeping Agreement with Fidelity and the Plan's 408(b)(2) disclosures (documents which they argue are "incorporated into the TAC," ECF No. 54 at 21 & n.6)—thus "rendering [Plaintiffs'] comparisons to 'comparable plans' implausible." *Id.* at 21–22. Defendants point out that the TAC alleges that the Plan paid for QDRO processing as an "a la carte" service, but the Recordkeeping Agreement states that the Plan pays for QDRO processing as part of its bundled fee. *Id.* at 22 (citing ECF No. 45-1 at 11 (TAC) and ECF No. 54-2 at 132 (Recordkeeping Agreement)). This means, Defendants argue, that Plaintiffs have "double count[ed]" at least one expense included in their estimate of the Total RKA fees that the Plan paid. *Id.* Moreover, if the Plan was paying for QDRO services as part of its bundled fee but other comparator plans were not doing so (as the TAC alleges, ECF No. 45-1 at 11 (stating that a la carte services "typically include" QDRO processing)), any comparison between the bundled fee rates of those plans is "apples-to-oranges." *Id.* In the same vein, Defendants point out that the TAC includes as part of the Plan's Total RKA Fees "other billable Company Stock Trust Fees," which the Plan's 408(b)(2) disclosure demonstrates is paid by WEC itself, not the Plan or its participants. *Id.* (citing ECF No. 45-1 at 19 and ECF No. 54-5 at 9).

Second, they argue that the TAC "employ[s] inconsistent methods for calculating [and comparing those] fees" the Plan paid versus other, the fees that comparator plans paid. *Id.* at 23. They point out that the TAC sources each plan's fees from different disclosures (408(b)(2) disclosures

versus Form 5500s), and "calculate[s] the Plan's fees based on an average over the entire class period" while "look[ing] to only a single year (2018) to determine how much each comparator plan paid," potentially "excluding earlier years in which those plans paid more." *Id.* (citing *Woznicki v. Aurora Health Care Inc.*, No. 20-CV-1246-BHL, 2022 WL 1720093, at *3 (E.D. Wis. May 27, 2022). They also note that Plaintiffs "[chose] five plans to claim the Plan's 'bundled' fee is excessive, and then disregard[ed] those five plans only to list 14 different plans to claim the Plan's 'total' fee is excessive." *Id.* at 21–22 n.7.

Defendants, in sum, are arguing that the TAC manipulates recordkeeping fee data. This, in their estimation, means that the TAC fails to meet *Hughes II*'s requirement to plead that recordkeeping fees were "excessive in relation to the services provided." *Id.* at 8–9 (quoting 63 F.4th at 632); *see also id.* at 21 (arguing that "Plaintiffs *do not* plausibly allege that the Plan's fees were excessive in relation to the services provided").

Plaintiffs offer no counterargument to Defendants' request that the Court consider the Recordkeeping Agreement and 408(b)(2) disclosures as incorporated into the TAC. Plaintiffs respond to the substance of Defendants' arguments by emphasizing that the Seventh Circuit in *Hughes II* "relied on materially identical allegations [in the complaint there at issue], also present in the TAC, for denying Northwestern's motion to dismiss." ECF No. 57 at 15; *see also id.* at 17 ("Defendants seek to undermine the obvious similarities between this case and *Hughes II*."). They go on to give examples of such allegations in the TAC, focusing on their allegations that RKA services are fungible and interchangeable across plans and recordkeepers, thereby establishing that the fees paid "were excessive relative to the recordkeeping services rendered." *Id.* at 16, 18 (citing *Hughes*

*II*, 63 F.4th at 632). With respect to Defendants' argument that the allegations in the TAC rely on faulty comparators to establish a reasonable RKA fee, Plaintiffs argue that "these are genuine disputes of material fact" that should be addressed on (and defeat) summary judgment. *Id.* at 19. They lean in to the Rule 12(b)(6) standard, responding that their allegations, accepted as true, establish "an equally, if not more, plausible inference" that the RKA fees that the Plan paid were excessive. *Id.* (quoting *Hughes II*, 63 F.4th at 633).

Each party offers one supplemental authority relevant to the motion to dismiss the recordkeeping claim. Plaintiffs point to a decision from the Northern District of Illinois in which the district court found similar ERISA recordkeeping claims plausible. ECF No. 69 (citing *Tolomeo v. R.R. Donnelley & Sons*, No. 20-CV-7158, 2023 WL 3455301 (N.D. Ill. May 15, 2023)). There, the district court denied the defendants' motion to dismiss and rejected the defendants' argument that "documents used by Plaintiffs to determine the comparator plans' rates contradict Plaintiffs' contention that the Plan and comparator plans received the same services . . . ." 2023 WL 3455301, at *4. The *Tolomeo* court relied on the plaintiffs' allegations that recordkeeping services are based on the number of participants and that services are generally fungible across plans irrespective of the recordkeeper providing them. *Id.*

Conversely, Defendants offer a decision from the Southern District of Indiana which came to the opposite conclusion. ECF No. 76 (citing *Mateya v. Cook Grp. Inc.*, No. 122CV01271RLYTAB, 2023 WL 4608536 (S.D. Ind. June 16, 2023)). The district court in *Mateya* granted the defendants' motion to dismiss, adopting several of their arguments. The court was persuaded that the plaintiffs' complaint failed to account for the "obvious

alternative explanation . . . [that] the Cook Plan and its comparators paid different amounts because they purchased different services," as shown by their Form 5500s. 2023 WL 4608536, at *5. It also adopted arguments, similar to those Defendants raise here, that the complaint relied on "methodological errors," namely, that the plaintiff "inconsistently count[ed] money paid toward secondary recordkeepers . . . [and] inconsistently add[ed] indirect compensation" to his estimate of the comparator plans' Total RKA Fees, and that he "compare[d] the Cook Plan's average cost over seven years against the single year cost of the comparators." *Id.* at *7. The district court found that these errors "prevent[ed] any like-for-like comparisons between the different plans [and] fatally undermine[d] any inference that [the recordkeeper's] fees were unreasonable." *Id.* (citing *Fritton v. Taylor Corp.*, No. 22CV00415ECTTNL, 2022 WL 17584416 (D. Minn. Dec. 12, 2022); *see also id.* at *8 ("At bottom, the problem with Mateya's complaint is that it attempts to compare numbers that mean different things.").

District court cases—most of which came after the filing of the motion to dismiss the TAC in this case—have gone both ways in applying the *Hughes II* pleading standard to the kinds of arguments Defendants now raise. Some courts have denied motions to dismiss. *Glick*, 2023 WL 9327209, at *5–6 (finding allegations that "other recordkeepers were providing the same level and quality of service to other mega plans as Transamerica provided to the ThedaCare plan" and that the defendant engaged in an imprudent decision-making process to select a recordkeeper were sufficient to state a claim); *Nohara v. Prevea Clinic Inc.*, No. 20-CV-1079-WCG-SCD, 2023 WL 9327202, at *4 (E.D. Wis. July 21, 2023), *report and recommendation adopted*, No. 20-C-1079, 2024 WL 233373 (E.D. Wis. Jan. 22, 2024) ("While I

agree that the method used to arrive at these estimated per-participant fees is suspect—and would probably fail to carry the case at summary judgment—for now, the fact that plans twice Prevea's size paid significantly less than Prevea in total annual bundled RKA fees nudges plaintiffs' claim that Prevea Plan participants paid higher fees over the plausibility line."); *Mazza v. Pactiv Evergreen Servs., Inc.*, No. 22 C 5052, 2023 WL 3558156, at *4 (N.D. Ill. May 18, 2023) ("While Defendants offer alternative explanations that warrant exploration during discovery, they are not so obvious that they require dismissal of Mazza's claim at the pleading stage, particularly given Mazza's allegations that RKA services are commoditized and that recordkeepers quote fees on a per participant basis without regard for individual differences in the services requested." (citing *Hughes II*, 63 F.4th at 629)).

Others have granted motions to dismiss. *Laabs*, 2023 WL 9321358, at *6 ("Because several of the comparator plans do not meet Laabs' definition of a 'large' plan, and because the plans are not similarly sized, the proposed trend line cannot be used to derive a reasonable fee. Therefore, Laabs has no basis to allege that the plan's recordkeeping fees were excessive relative to the services rendered." (collecting cases)); *Probst v. Eli Lilly & Co.*, No. 122CV01106JMSMKK, 2023 WL 1782611, at *10–11 (S.D. Ind. Feb. 3, 2023) (dismissing complaint where allegations that "all mega plans receive nearly identical recordkeeping services" were "wholly conclusory" and the complaint relied on a comparison table with plans that were "not all similar in size to the Plan [at issue], nor [did] they have similar assets"); *Cotter v. Matthews Int'l Corp.*, No. 20-CV-1054-WCG-SCD, 2023 WL 9321285, at *5 (E.D. Wis. Aug. 9, 2023), *report and recommendation adopted*, No. 20-C-1054, 2024 WL 218417 (E.D. Wis. Jan. 19, 2024) (granting motion to dismiss where

"the so-called comparators var[ied] significantly in size" and the plaintiff "did not use a consistent methodology for determining the plans' recordkeeping fees," which was "especially problematic given that the [defendant's] plan significantly reduced its recordkeeping fees over those five years"); *Guyes v. Nestle USA, Inc.*, No. 20-CV-1560-WCG-SCD, 2023 WL 9321363, at *6 (E.D. Wis. Aug. 23, 2023), *report and recommendation adopted*, No. 20-C-1560, 2024 WL 218420 (E.D. Wis. Jan. 19, 2024) ("Without the comparison to fees paid by other plans, Guyes simply alleges in a conclusory fashion that the Nestle plan paid too much for the same quality of services and failed to regularly solicit competitive bids for recordkeeping fees."); *Lard v. Marmon Holdings, Inc.*, No. 1:22-CV-4332, 2023 WL 6198805, at *4 (N.D. Ill. Sept. 22, 2023).[9]

Shifting back to the instant motion to dismiss: in the absence of further guidance from the Seventh Circuit about the precise contours of the *Hughes II* pleading standard, the Court finds Defendants' arguments that Plaintiffs have failed to plead suitable comparators—and authorities such as *Mateya* and those cases like it, including *Laabs*, *Probst*, *Cotter*, *Guyes*, and *Lard*—largely persuasive.[10] As Magistrate Judge Stephen Dries has explained, merely

_____

[9]Counsel for Plaintiffs and Defendants also litigated for those respective sides in many of the cases cited here.

[10]To the extent that Defendants implicitly argue, through submission of the *Mateya* case, that Plaintiffs are required to allege with specificity what recordkeeping services the Plan and comparator plans each received, the Court does not adopt that specific argument. Plaintiffs' allegations that other recordkeepers provided a similar level and quality of service as Fidelity did to the Plan are sufficient to meet the *Hughes II* pleading standard. *See Laabs*, 2023 WL 9321358, at *5 (declining to adopt similar argument). The recordkeeping claim fails the plausibility test for distinct reasons discussed below.

[p]leading that recordkeeping fees were too high . . . is not sufficient to state an ERISA duty-of-prudence claim. Rather, the plaintiff must "plead[] sufficient facts to render it plausible that [the plan] incurred *unreasonable* recordkeeping fees." *Hughes II*, 63 F.4th at 631 (emphasis added). In *Matousek* [*v. MidAm. Energy Co.*], the Eighth Circuit explained that "[t]he key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" 51 F.4th [274,] 278 [(8th Cir. 2022)] (quoting *Davis []*, 960 F.3d [at] 484 . . . . The Seventh Circuit embraced that rule in *Albert*, as it relied on the same *Davis* quote to affirm the dismissal of two duty-of-prudence claims. 47 F.4th at 581–82 (quoting *Davis*, 960 F.3d at 484). And in *Hughes II* the court found it crucial that the plaintiffs had alleged that the proposed alternative fee was reasonable "based on the services provided by existing recordkeepers and the Plans' features." 64 F.4th at 632.

*Laabs*, 2023 WL 9321358, at *5. Accordingly, "[c]ourts may permissibly question a plaintiff's selected comparators at the pleadings stage of litigation." *Id.* at *6. And where a plaintiff's "selected comparator plans do not provide a sound basis for comparison," such as when "the plans are not similarly sized," when the plaintiff uses a flawed methodology for determining recordkeeping fees across plans, or when the plaintiff otherwise attempts to compare plans with disparate features to argue that a proposed alternative fee is reasonable, dismissal is appropriate. *Id.*; *Cotter*, 2023 WL 9321285, at *5; *Guyes*, 2023 WL 9321363, at *5–6.

That is what Plaintiffs do here. First, the Court agrees that Plaintiffs' charts comparing Bundled and Total RKA Fees, ECF No. 45-1 at 20–21, do not provide a sound basis for drawing inferences or conclusions about the reasonableness of the per-participant RKA fees that the Plan paid. Plaintiffs compare the Plan's per-participant Bundled RKA Fee—calculated at an

average of ██ for 2016 to 2021—to those paid by five other plans in undisclosed years. *Id.* at 19–20. Plaintiffs aver that these five other plans paid between $20 and $30 per participant in Bundled RKA Fees—but *when*? Plaintiffs have declined to indicate whether the Bundled RKA Fee figures they provide are indeed from the relevant time period, or just random years. The Court also has trouble accepting that these five plans—which have either significantly fewer (1,501) or more (14,255, 17,585, 36,916, and 45,018) participants and manage anywhere from under $312 million to over $8 billion in assets—are of a "similar size[]" or have "similar amounts of money under management" as the Plan (which managed between $1.4 billion and over $2 billion in assets and had between 4,777 and 5,433 participants during the relevant period). *Id.*; *id.* at 8. It is unclear why Plaintiffs offer these rather disparate plans as comparators while repeatedly stressing in the TAC the impact that the number of participants and asset pool size has on fee rates.

Similarly, Plaintiffs offer fourteen different comparator plans' Total RKA Fees, based on 2018 data alone and ranging from $20 to $49 per participant, and ask the Court to conclude that the Plan's Total RKA Fee rate, which ranged from ████████ per participant in 2016 to 2021 (and was ██ per participant in 2018), can be considered objectively unreasonable. *Id.* at 18, 21. At a glance, the Plan's ██ Total RKA Fee in 2018 indeed dwarfs the comparator plans' $20–$49 Total RKA Fee range in the same year. But accepting that this comparison reveals an unreasonable fee requires "arbitrarily limit[ing] the universe of comparator plans," *Woznicki*, 2022 WL 1720093, at *3, and requires the Court to disregard the full breadth of the time period that Plaintiffs themselves defined as relevant in this case. Why not reveal the fees the comparator plans paid in 2016–2017 and 2019–

2021? Similarly, this set of comparator plans had anywhere between $99.8 million and $1.2 billion in assets under management. ECF No. 45-1 at 21. The Plan had no less than $1.4 billion in assets under management at any time between 2014 and 2020. *Id.* at 8. In other words, Plaintiffs' smallest comparator plan had about fifteen times fewer assets than the Plan did in 2018, and its largest comparator plan had fewer assets than the Plan had at any time. *Id.* at 8, 21. If Plaintiffs repeatedly stress the relevance of the "mega plan" designation, which is driven by the amount of assets under management, *see, e.g.*, *id.* at 6, 9–11, 15, 23–24, why do they rely on comparators that do not fit that definition? Plaintiffs have had access to other plans' approximate recordkeeping rates from the inception of this case, *see* ECF No. 1 at 23–25, yet they still fail to present a set of appropriate comparator plans.[11]

The Court is also persuaded by Defendants' arguments that documents outside of, but referenced in, the TAC call into doubt the reliability of the Plan's fee figures as calculated by Plaintiffs, and, therefore, the plausibility of the conclusions that can be drawn from them. The Court will consider the Recordkeeping Agreement and the Plan's 408(b)(2) disclosures in resolving these arguments for dismissal. "In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim.'"

---

[11]Plaintiffs now deduce other plans' recordkeeping fees and the Plan's fees from different documents (Form 5500s vs. 408(b)(2) disclosures), lending further doubt to how accurate a fee based on the Form 5500 is and how comparable Plaintiffs' fee figures are. ECF No. 45-1 at 18, 21. Discovery has revealed that Plaintiffs' estimate of the Plan's RKA fees—most likely based on the Plan's Form 5500—in the original complaint was overstated. *Compare* ECF No. 1 at 23 ($147 RKA Fee) *with* ECF No. 45-1 at 18 (███erage Total RKA Fee, based on 408(b)(2) disclosure).

*Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quoting *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992)). "This freedom includes . . . documents referenced in the pleading if they are central to the claim . . . ." *Id.* (citing *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012)). The TAC extensively references the Recordkeeping Agreement and the Plan's 408(b)(2) disclosures such that these documents are central to Plaintiffs' recordkeeping claim and may be relied upon on weighing the TAC's sufficiency.[12]

The Court agrees that the Recordkeeping Agreement and the 408(b)(2) disclosure contradict the TAC and must control. "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Id.* (citing *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007)). Plaintiffs have not attempted to explain why the TAC is inconsistent with the Recordkeeping Agreement and the 408(b)(2) disclosure. *See id.* ("That is not to say that a plaintiff cannot contradict the apparent meaning or significance of a document or other exhibit. . . . But a plaintiff whose case relies on contradicting such an attachment needs to explain her position."). Plaintiffs have argued only that the issue is one for summary judgment. But the contradictions between the allegations in a pleading and information in the documents on which those allegations rely do not create an issue of disputed fact; portions of pleadings alone cannot be relied on to create a

---

[12]Although the TAC references the comparator plans' Form 5500s, and those forms are public record and therefore subject to judicial notice, *Lard*, 2023 WL 6198805, at *4, n.3 (citations omitted), Defendants have not pointed to any specific inconsistencies between their contents and the TAC. Therefore the Court does not go beyond the TAC to consider the contents of those forms.

genuine dispute of material fact. *See Reger v. Ariz. RV Ctrs., LLC,* 515 F. Supp. 3d 915, 959 (N.D. Ind. 2021) ("Yet to overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings."). If anything, the contradictions create a threshold issue of candor to the tribunal.[13] Plaintiffs' refusal to acknowledge that certain line items (for QDRO processing and Company Stock Trust Fees) are misallocated in the TAC undermines their insistence that they have provided accurate figures for the Plan's Bundled and Total RKA Fees.

In all, the Court agrees with Defendants that the TAC relies too heavily on Plaintiffs' self-serving calculations of what is a reasonable RKA fee, as compared to what the Plan paid, to provide any sound basis for the Court to conclude that the RKA fees the Plan paid were "excessive in relation to the services provided." *Hughes II,* 63 F.4th at 632 (citing *Albert,* 47 F.4th at 580). Accordingly, Defendants' motion to dismiss the recordkeeping claim will be granted, and that claim will be dismissed. Plaintiffs have not requested leave to amend again, and they have failed to state a viable recordkeeping claim despite amending their complaint three times; under these circumstances, permitting them leave sua sponte to amend the TAC is unnecessary. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.,* 786 F.3d 510, 520 (7th Cir. 2015). Therefore the dismissal of the recordkeeping claim will operate with prejudice. *Laabs,* 2023 WL 9321358, at *9 (citing *Matousek,* 51 F.4th at 282–83).

---

[13]Consistent with the Court's prior discussion related to the recordkeeping claim, although it will not require Plaintiffs to plead what can only be known through discovery, it will not permit Plaintiffs to rely on or incorporate documents into their pleading and simultaneously present manipulated data that contradicts those documents.

### 4.2    Investment Claim

Defendants argue that Plaintiffs' investment claim fails to plausibly allege that it was imprudent to offer the Active Suite. ECF No. 54 at 29. Specifically, they note that the TAC fails to raise "a single allegation related to the ITPC's process for monitoring investments" and instead relies on "an attenuated and unsubstantiated inference . . . that it was imprudent to continue to offer the [Active Suite] because 'investor demand for low-cost target date options has skyrocketed in recent years.'" *Id.* (quoting ECF No. 45-1 at 29). They further point out that Plaintiffs' comparator investment options are suspect and that Plaintiffs have not pleaded "a single fact as to either the challenged funds or their comparators['] price, performance, investment, strategies (active vs. passive), or any other facts that could demonstrate that the comparison is a 'meaningful benchmark.'" *Id.* (quoting *Albert*, 47 F.4th at 581).

Plaintiffs respond by emphasizing that the TAC's investment claim is "materially identical" to the allegations that survived a motion to dismiss in *Hughes II*, except that theirs "is not a share class claim." ECF No. 57 at 17. In reply, Defendants emphasize that *Hughes II* is distinguishable precisely because it treated a share class claim, which is not the type of claim Plaintiffs raise here. ECF No. 65 at 8. Plaintiffs also state, in a conclusory fashion, that their alternative investment comparator chart offers plenty of "prudent alternative investments in the same asset category" which serve as "meaningful benchmark[s]" for comparison. ECF No. 57 at 17.

The Court agrees with Defendants. First of all, the TAC suffers from a basic lack of coherence. It does not name all the investment options Plaintiffs challenge, *see supra* note 8; as a result, the Court will presume that Plaintiffs attempt to challenge only the Fidelity Freedom Fund Active Suite.

Additionally, Plaintiffs provide conflicting descriptions of the timeline on which the Active Suite was offered. *See supra* note 7.

Moreover, the TAC does not provide a sound basis from which the Court can infer any actionable imprudence. The Court first notes that it does not fully agree with Defendants that the TAC fails to make any allegation going to an imprudent process by Defendants; it makes allegations about what prudent fiduciaries might do to properly select and retain investments, *see* ECF No. 45-1 at 26 ("[T]here is a commonly accepted process to select and monitor investment options . . . ."), and then alleges that Defendants failed to do those things, *id.* at 30 ("had . . . Defendants acted prudently by engaging in an objectively reasonable investigation when selecting its investments"). As noted above, Plaintiffs cannot have been expected to plead information that only discovery would reveal. But the Court agrees that the allegations that trade publications' discussion of unnamed investors' lack of confidence in the Active Suite should have prompted the ITPC to remove the Active Suite from its menu of investment options do not plausibly show imprudence. Without further allegations from Plaintiffs that the ITPC had some knowledge of potential problems with the Active Suite, the TAC does not plausibly support a claim that the ITPC was imprudent for failing to act on a general observation.

Moreover, the TAC is utterly devoid of meaningful investment comparators. Plaintiffs state that "any of the [other] target date families offered by Fidelity" would have been adequate alternatives to the Active Suite, ECF No. 45-1 at 28, but do not explain what monetary difference these alternatives would have made. They provide a chart full of other alternatives but then provide no explanation as to what makes them suitable benchmarks. Like their recordkeeping comparators, Plaintiffs

appear to have cherry-picked other investment options to make their case that the Active Suite was an unwise choice. (And while Plaintiffs might understand what the numbers in the comparison chart mean, they leave the Court in the dark—the TAC provides no explanation for the import of these numbers, let alone why they entitle Plaintiffs to $74 million in damages.) A set of comparators presented entirely without context or explanation does not provide a meaningful benchmark for this Court to even begin to determine whether Defendants' investment choices were reasonable. *See Cotter*, 2023 WL 9321285, at *6–7 ("[T]he difference in cost alone is not enough to support a duty-of-prudence claim . . . . The . . . complaint . . . does not allege that the comparator target-date funds were actively managed or put forth any nonconclusory allegations establishing that the comparator funds were suitable alternatives.") (citing *Coyer v. Univar Sols. USA Inc.*, No. 1:22 CV 0362, 2022 U.S. Dist. LEXIS 175972, at *16–17 (N.D. Ill. Sept. 28, 2022)); *see also Glick*, 2023 WL 9327209, at *6.

As noted above, despite Plaintiffs' characterization of the investment claim as encompassing a claim that management fees were too high—as opposed to returns on the Active Suite being too low—a claim of imprudence premised on excessive management fees finds no footing in the TAC. To the extent that Plaintiffs even intended to proceed on this theory of an investment claim, they have offered no factual allegations to back it up.

Finally, Defendants argue that the investment management claim should be dismissed for lack of standing because "Plaintiffs did not invest in [certain challenged funds], [and therefore] suffered no injury from the ITPC's decision to offer (and continue to offer) them as investment options . . . ." ECF No. 54 at 31. Because the Court resolves the investment

claim on the sufficiency of the pleading, it does not reach Defendants' arguments related to standing.

For all these reasons, Plaintiffs' investment claim will be dismissed. And for the same reasons as with the recordkeeping claim, the dismissal will operate with prejudice.

### 4.3    Failure to Monitor Claims

Because Plaintiffs have failed to sufficiently allege any underlying breach of the duty of prudence, their failure-to-monitor claims—which they state are "derivative" of the underlying claims, ECF No. 57 at 33—must also be dismissed. *See Albert*, 47 F.4th at 583 (citing *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010)). The dismissal will operate with prejudice.

### 5.    CONCLUSION

As stated above, Defendants' motion to dismiss, ECF No. 50, will be granted in full; to the extent it sought summary judgment, it will be denied as moot. Plaintiffs' motions for class certification, ECF No. 59, and to strike, ECF No. 68, will also be denied as moot. This case will be dismissed with prejudice in its entirety.

The motions to restrict, ECF Nos. 49, 56, and 64, are all granted, and the documents subject to those motions will be maintained under restriction. Because this Order may contain information that is subject to the protective order, the Court will issue it in restricted form. The parties must confer and, on or before **April 12, 2024**, file a joint notice stating what redactions will apply to this Order, which the Court will then incorporate in a redacted, public-facing version.

Accordingly,

**IT IS ORDERED** that Defendants WEC Energy Group, Inc. and the Wisconsin Energy Investment Trust Policy Committee's motion to dismiss the Third Amended Complaint, ==ECF No. 50==, be and the same is hereby **GRANTED**; to the extent Defendants' motion sought summary judgment, it is **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiffs Jonathan Munt, Gloria J. Harmon, and Sandra M. Wingers's motion for class certification, ==ECF No. 59==, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiffs Jonathan Munt, Gloria J. Harmon, and Sandra M. Wingers's motion to strike, ==ECF No. 68==, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that the motions to restrict, ECF Nos. 49, 56, and 64, be and the same are hereby **GRANTED**; the documents subject to those motions will be maintained under restriction; the parties shall confer and, on or before **April 12, 2024**, file a joint notice stating what redactions will apply to this Order; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is instructed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of March, 2024.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge